58 N.J. Super. 185 (1959)
156 A.2d 15
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ALFONSE J. BEGYN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 14, 1959.
Decided November 23, 1959.
*190 Before Judges CONFORD, FOLEY and HALPERN.
Mr. Louis Santorf argued the cause for defendant-appellant.
Mr. Frank J. Cuccio, Assistant Prosecutor, argued the cause for plaintiff-respondent (Mr. Guy W. Calissi, Bergen County Prosecutor, attorney; Mr. William C. Brudnick, on the brief).
The opinion of the court was delivered by FOLEY, J.A.D.
The defendant was found guilty in the Bergen County Court on the first count of a two-count indictment which charged the common law crime of misconduct in public office. N.J.S. 2A:85-1. The second count was dismissed on the State's motion at the conclusion of its case.
Briefly stated, the first count alleged that Begyn, as Sanitary Inspector of the Department of Health of the Borough of Fair Lawn, corruptly agreed with Angelo A. Mastrangelo, now deceased, and with Ralph Mastrangelo and *191 Josephine Mastrangelo, acting for the estate of Angelo A. Mastrangelo, that he would use his influence as a public officer to "take care of and minimize" complaints of the public arising from the performance of a garbage removal contract between Angelo A. Mastrangelo (and subsequent to his death, his estate) and the borough; that he would use his influence to avoid a declaration of default by the borough; that he demanded and received from Ralph and Josephine Mastrangelo sums of money for past, present and future services performed in pursuance of the corrupt agreement.
The sufficiency of these allegations to charge the common law crime of misconduct is beyond debate. In State v. Weleck, 10 N.J. 355, 365 (1952), misconduct in public office was defined as any act or omission in breach of a duty of public concern by one who has accepted public office. The rationale of the Weleck case is that proof of the crime is complete if there is a showing (1) that defendant held a public office and (2) that in his official capacity he corruptly entered an agreement adverse to the public interest. Defendant challenged the sufficiency of the State's proof in both respects enumerated and contends that his motions for a judgment of acquittal should have been granted. As to the interchangeability of the concepts of corruption and willfulness in this connection see State v. Williamson, 54 N.J. Super. 170, 183-184 (App. Div. 1959), affirmed 31 N.J. 16 (1959).
The supporting argument takes two courses. First, it asserted that during the period of time set forth in the indictment defendant did not hold the office of sanitary inspector as charged therein, but was in fact performing the duties of a sanitarian as the result of an unauthorized appointment by the municipal manager, and that this showing was fatal to the State's case. The contention is unrealistic. The defendant openly, notoriously, and for pay, was engaged in the supervision of the performance of the Mastrangelo contract in behalf of the borough and was chargeable as a public officer with misconduct if he willfully failed in *192 a public trust arising from the performance of the duties he had undertaken. In these circumstances the public interest overrode both the alleged misdesignation in the indictment of Begyn as a sanitary inspector and consideration of the effect of the alleged irregularity attending his appointment as sanitarian upon his status as public officer.
Next it is claimed that there was no evidence from which a corrupt agreement between the Mastrangelos and defendant could be inferred. We disagree. The testimony of Josephine Mastrangelo and Ralph Mastrangelo and Michael Bava, an employee of the Mastrangelos, supplied the following permissible factual hypothesis: in May 1954 Angelo A. Mastrangelo entered a three-year contract with the borough for the collection of garbage. At that time he was associated with his sister Josephine in the garbage disposal business and maintained offices at 756 Fairview Avenue, Fairview, New Jersey. From then until September 14, 1954, when Angelo died, Begyn came to the office about once a month and conferred with him. Upon his death his estate took over the operation of the business and Josephine, holding a 25% interest in the profits, continued in her duties as office manager. About a month or two later Begyn called at the office and told Josephine that her deceased brother "had made a certain promise to him for some special favors he had done and he would like to find out if he could get the promise" that her brother had made to him; and that these "favors" were referable to complaints of the "miserable service" which was being furnished at the time. He then stated that he wanted "about $8,000." Josephine told defendant that the company was in financial difficulties; that there was no money in the estate and that Begyn should "just forget the promise, that would be the best thing to do."
Angelina Mastrangelo, widow of Angelo, had been appointed administratrix of the estate, and her son Ralph was then acting as her representative. At about the same time he visited Josephine, Begyn called upon Ralph and after discussing a few of the garbage problems told Ralph that his father had *193 made a commitment to him before he had passed away, that he would do something for him as far as the new contract was concerned because Begyn was "assisting their project sanitation-wise, health-wise," and was "minimizing complaints" to the best of his ability. Ralph informed defendant that there was no money in the estate but that he would discuss the matter with the family to see if anything could be done. On at least two occasions between then and April 27, 1955 Begyn renewed his request for money. On the second of these, at a meeting in the Fairview office, Ralph told Begyn that they could not give him any cash "in any way, manner, shape or form"; that financially they weren't able to do anything; but that possibly they wolud be able to give him a check for $1,000 in a short period of time. Begyn did not like the idea but agreed to accept a check although he preferred cash. On April 27, 1955 the first of 11 checks was given and at Begyn's suggestion Richard Kuhlenkamp was designated as payee. The last of the checks was given in December of 1955 and, in each instance save one, Richard Kuhlenkamp was named payee on Begyn's designation; the other check being made payable to Swiss Pork Store at Begyn's behest. All checks were picked up by Begyn at the Mastrangelo office and he received the proceeds, in sum approximating $2,500. On the recommendation of the Mastrangelo accountant, in order to "avoid suspicion" all checks except that for $1,000 were made in odd amounts. Throughout the entire period of the payment the garbage disposal operation was under severe criticism by the public and the services rendered were the source of continuous complaint. Begyn by his own admission to Bava actively attempted to "minimize" the complaints with the design of preventing them from coming to the attention of his superiors.
The test on a motion of defendant for a judgment of acquittal is whether there is any legal evidence before the jury from which an inference of guilt can be legitimately drawn. State v. Kollarik, 22 N.J. 558, 564 (1956); State *194 v. Rogers, 19 N.J. 218, 231-232 (1955); State v. Picciotti, 12 N.J. 205 (1953); State v. Bricker, 99 N.J.L. 521 (E. & A. 1924); State v. Fox, 12 N.J. Super. 132 (App. Div. 1951). Plainly, the postulate recited above required the trial court to deny a motion for a judgment of acquittal which was addressed to the first count of the indictment at the end of the State's case, since from it legitimate inferences could be drawn (1) that this public official demanded and received promises of payment of moneys from one having a contract with the borough, as a part and parcel of the agreement to serve the contractor in the "minimizing of complaints," and actually received moneys in pursuance of the promises; and (2) that the agreement and payment were in violation of defendant's public duties and were corrupt in the sense that they had the capacity of depriving the public of the full benefit of his services and of his undivided loyalty to the public welfare.
The defendant did not deny receipt of the checks. His defense was centered entirely in his assertion that the commitment of Angelo A. Mastrangelo was completely voluntary, originated with Mastrangelo, and resulted from the latter's gratitude for work Begyn had been doing after his daily hours of work and on weekends and Sundays, in an effort to get the collections made expeditiously and thereby satisfy the residents. The indications were that this supervision was necessary because the Mastrangelo firm had delegated the performance of the contract to Rotondo and Stamato, other scavengers, who were not doing it efficiently. As a result, residents whose garbage was not picked up would phone Begyn at night to complain. He expressly denied that he had ever requested or demanded money from either Ralph or Josephine Mastrangelo. He testified that Ralph sought him out after his father's death to tell him that payments would be continued as in his father's lifetime. He said the Mastrangelo accountant suggested a "dummy" name on the checks for tax purposes. Obviously, the effect of defendant's testimony was merely to controvert the inferences *195 to be drawn from the State's proof. A typical case for jury determination was thus presented and the court properly denied the motion for judgment of acquittal which was made at the close of the entire case.
Defendant also challenges the action of the court in permitting the jury to take the indictment to the jury room notwithstanding that judgment of acquittal had been entered on the second count, claiming that examination by the jury of the allegations of the second count was prejudicial. In connection with this action the court said:
"Now, as to the indictment in this case which you will have in the Jury room with you, let me say, first, that at the end of the State's case on a motion by the State, the Court entered a judgment of acquittal on the second count of this indictment, and, therefore, you will pay no heed or no consideration to the second count; that is not before you, nor to any evidence in respect to the second count that was in this case. Anything about the second count is not before you whatsoever and you give it no consideration. You consider that one of the extraneous matters I mentioned. You consider only the first count of the indictment."
When a jury is explicitly instructed to disregard a matter in plain and forceful language it will be assumed that the jurors, being mindful of their oath, followed the court's instructions. State v. Curcio, 23 N.J. 521 (1957).
The remaining points raised by the appellant involve criticism of certain portions of the court's charge. It is urged that the court erroneously instructed the jury:
"The two Mastrangelos, Ralph and Josephine Mastrangelo, who testified for the State in this case, are classified by the Court and I charge you that they are what we call accomplices in this case, in this offense charged in this indictment. They admittedly gave money to the defendant Begyn to serve their own interest under their garbage contract and they are as much guilty of misconduct in office as the defendant, under their own testimony." (Emphasis added)
The charge appears to be erroneous in the respect that the Mastrangelos, not being public officials, could not possibly be guilty of the crime of misconduct in office. But this is beside the point since they were not before the court *196 as defendants. In a sense the charge of the "accomplice rule" which immediately followed redounded to the benefit of the defendant as it required the jury to scrutinize the testimony of the Mastrangelos more closely than if they had not been "accomplices." On the other hand, the introduction of the accomplice rule was harmful to the defendant since in its very nature it implied defendant's guilt. Obviously, there cannot be an accomplice without a guilty principal. Thus there was conveyed to the jury the impression that if the Mastrangelos became accomplices to the commission of the crime of misconduct merely by the payment of money to Begyn, he, as the principal in the crime, was guilty merely by reason of having accepted the payments. The mischief created thereby was that the jury was permitted to base a conviction on a theory of criminal responsibility other than that charged in the indictment. The core of the indictment was that the defendant had entered a specified corrupt agreement. And while the acceptance by Begyn of the payments may have been regarded by the jury as evidence of the existence of such corrupt agreement, in and of itself it did not establish guilt of the crime charged.
The court also charged:
"In summary, he was charged with the duty not to serve two masters whose interests are adverse. He was under a duty to refrain from serving at one time, at once, and one and the same time, as the Sanitary Inspector of the Borough of Fair Lawn charged with supervision of enforcement and observance and checking complaints in respect to the garbage contract, and at the same time being in the employ or an agent or on the payroll serving the interests of the garbage collector under the garbage contract whose very work he was charged with watching, inspecting; and how can anyone at one time be paid as a public official to see to it that a garbage contract is properly performed and the Sanitary Code is properly observed and enforced in respect to garbage collection and at the same time be paid by the garbage collector, the one being inspected and observed, to assist him in any way in respect to garbage collection complaints, performance. The interests are adverse. The garbage collector has one interest, the Borough another, and when you are serving both you are serving two masters with adverse interests; and you have a duty as a public official not to serve two interests where their interests are adverse to one another, and that *197 is the duty that is prescribed by this office by the very nature of the office. You cannot be paid by the very man you are supervising, checking, and watching and seeing to it that he observes the sanitary laws while you are the public official being paid by the Borough, by the public, to see to it that that garbage contract is properly fulfilled and carried out according to the agreement and according to the sanitary laws. You cannot serve two masters with adverse interests, and when you do, if you do, you are guilty of misconduct in office." (Emphasis added)
The statement, that if Begyn served two masters whose interests were adverse he was guilty of misconduct in office, expanded his criminal responsibility beyond the boundaries of the indictment and permitted a conviction even though the jury was not satisfied beyond a reasonable doubt that the "corrupt agreement" on which the indictment was predicated had been proven. The force of this observation is strengthened by the way the court treated with the contention of defendant that he received the moneys as payment voluntarily made by the Mastrangelos for work he did for them outside of his regular work or duties for the borough. It said to the jury:
"You have to determine from the evidence what the payments were for. The Mastrangelos say one thing, Begyn says another, but there is no question and no denial and no doubt about the fact that these checks were drawn by the Mastrangelos and delivered to Begyn, and he got the proceeds of them, in connection with the garbage contract, and that he got it for work outside of the hours of his office makes absolutely no difference. The test is, and the issue is, did he get it in connection with the garbage contract work over which he had supervision, which he was charged with the duty. If he worked for the Mastrangelos as an accountant in their office outside his regular hours on anything but the garbage contract or painted their barn, painted their house, he did some work for them outside of his regular hours, outside of the work in connection with the garbage contract with the Borough of Fair Lawn, he could not be charged with misconduct in office for taking money for such work. But if he took moneys from the Mastrangelos for something he did, was doing, or would do, or had done in connection with the garbage contract, with which he had these duties I have already delineated to you, in respect to his public office, then whether he did it outside the regular hours of his office or not, makes no difference. That is misconduct in office."
*198 Thus the jury was told in terms that could not possibly have been misunderstood that if Begyn took money from the Mastrangelos for work he did for them having a connection with the performance of the garbage contract, this, in and of itself, was "misconduct in office," for which, by plain implication, the jury could convict him. Completely omitted from that context was the admonition that a conviction required a finding by the jury that defendant and the Mastrangelos had made an agreement for defendant to minimize complaints, et cetera, on their behalf and that the moneys were paid pursuant to that agreement.
Objection was noted by counsel to the portions of the charge above noted pursuant to R.R. 3:7-7(b). Although the objection was not stated in the precise tenor of the defect as we have analyzed it, the specific point was made on the oral argument, and we consider that the error is so fundamental in respect to defendant's right not to be convicted except for the charge laid in the indictment, as to constitute "plain error" R.R. 1:5-1(a).
We come now to a part of the charge to which objection was not taken. The trial judge reviewed at considerable length the various facets of the evidence and in doing so laid stress on the proofs offered by the State and the inferences to be drawn therefrom upon which a verdict of guilty could be founded. He concluded his dissertation with the following:
"There is sufficient evidence just from what I have picked up at random to cite for you an example, if you find it credible, to find a violation of the duty to serve the best interests of the Borough of Fair Lawn, uninfluenced by any notices or interest of any adverse interest, the garbage collectors themselves, the garbage contractors."
Despite the fact that a reading of the factual recital conveys a strong impression that the court was satisfied of defendant's guilt, and that the jury may well have been aware of the court's state of mind, the judicial comment incorporated therein, although unfavorable to defendant, is beyond challenge *199 since the court made it clear at various stages of the charge that the jury were the sole and exclusive judges of the facts and of the conclusions to be drawn therefrom. State v. Peterson, 10 N.J. 155, 162 (1952), and cases cited therein. However, immediately following and in conjunction with the above quoted excerpt the court went on to say:
"In fact, there is sufficient evidence from the testimony of the defendant alone, corroborating all this, if you find it credible, to find him guilty, as he admits taking the money from the garbage collectors by these checks; he admits the office, that he was either Sanitary Inspector or Sanitarian, or whatever you call it, he admits that; he admits that he was paid regularly by the Borough and he admits that he was paid by the Mastrangelos; admits receiving the proceeds of all those checks; admits he gave Kuhlenkamp's name to the Mastrangelos to put on these checks for these payments." (Emphasis added.)
We deem this to be something more than "comment." The instruction appears to us to be susceptible of the interpretation that defendant "corroborated" every fact necessary to the proof of the corrupt agreement charged in the indictment and that if the jury found him credible he stood convicted out of his own mouth. While it is true that the admissions alluded to were in the evidence, the setting in which the payments were made, the reasons for them, the purpose of them, the giving of Kuhlenkamp's name, were all matters which were either directly or inferentially in dispute as they bore on the crucial issue of whether or not the defendant had entered the particular corrupt agreement for which he was on trial. It was not so much what happened, as why it happened, which should have concerned the jury in its deliberations and the defendant was entitled to have the jury know that despite the so-called admissions defendant's version, if believed by the jury, was entirely consistent with his innocence. The State argues that the trial judge merely submitted comment on the evidence and cites the several conventional admonitions in the charge that the jury should rely upon its own recollection of the evidence if it *200 differed from that of the court. As we have pointed out, the right of the court to comment on the evidence, even in strong terms, is settled. But such comment must not equate a given set of facts with guilt if such facts are not tantamount to the factual charge of crime specified in the indictment; and that, we are convinced, is what the court did here. While at the beginning of the charge the court paraphrased the indictment, including the alleged corrupt agreement, it failed to mention that agreement again in any portions of the charge quoted above. So there were given to the jury what purported to be complete definitions of the crime of misconduct in office, as applied to this case, which omitted the necessary finding of the existence of the agreement or understanding.
Only at one other point, in isolation from the references above mentioned, did the court refer to the requirement that the jury find as a basis of conviction that the payments were made pursuant to a corrupt agreement. In that connection the court said:
"You will have to determine from the facts that you have heard, from the testimony in the case, from all the testimony, was that the purpose for which Begyn gave Mastrangelo the name of Kuhlenkamp for these checks, for tax purposes or because it was a surreptitious transaction, a corrupt payment under a corrupt understanding between the Mastrangelos and Begyn?
That is the issue on that point. That is what you will have to decide, and there is sufficient evidence, what I have cited here to you, that you can find, if you find this evidence credible, that the Mastrangelos surreptitiously paid this money to Begyn and Begyn surreptitiously received it under a corrupt understanding, corrupt agreement. By corrupt we mean something against or forbidden by law. By corrupt we mean exactly the opposite of honesty, involving intentional disregard of law from improper motives."
As to this, it will be observed that the "corrupt agreement" was not described as charged in the indictment, i.e., to protect the Mastrangelos by "minimizing complaints," et cetera, but, quite differently, enveloped any agreement which was corrupt in the sense of being "against or forbidden by *201 law." Since the court had already told the jury that the mere entry into an employment relationship by defendant with both the municipality and the Mastrangelos was against the law because it involved the service of two masters with adverse interests, this instruction did not repair the defect already noted, even if the jury could be said to have related it to the court's unqualified summation of the evidence as establishing defendant's guilt, in which no reference whatever was made to a corrupt agreement.
The basic error we discern in each of the cited portions of the charge is that the court opened the door to a conviction based on an act of official misconduct other than the particular act charged, namely, the entering of a defined corrupt agreement. As a result the defendant was deprived of the fundamental constitutional right "to be informed of the nature and cause of the accusation." N.J. Const. 1947, Art. I, par. 10. Cf. State v. Campisi, 23 N.J. 513, 518 (1957). Of necessity this guarantee embraces the right to have his guilt or innocence determined only upon the basis of the accusation which he is called upon to face, and it "is conclusively presumed that the defendant is prejudiced when he is convicted on evidence which does not go to the guilt of the specific offense the State chooses to charge him with and try him for." State v. Campisi, 42 N.J. Super. 138, 155 (App. Div. 1956). It follows that it should be presumed no less that he is prejudiced when convicted on evidence which goes to his guilt of an offense, but of itself does not make out the specific crime charged. See also State v. Flynn, 76 N.J.L. 473, 475-476 (E. & A. 1909); State v. Grothmann, 13 N.J. 90, 97-98 (1953). And see concurring opinion in State v. Williamson, 31 N.J. 16 (1959).
As we have already observed, the precise respects in which the charge was erroneous were not brought to the attention of the trial court by counsel through the media of definitive objections. However, on the oral argument both parties presented their views concerning the criticized portions *202 of the charge and with the permission of the court subsequently filed supplemental briefing. The State argues that if error was committed it was harmless when considered in the context of the entire charge. We disagree. The test is how and in what sense under the evidence before them and the circumstances of the trial would ordinary men and jurors understand the instructions as a whole. State v. Pitman, 98 N.J.L. 626, 628 (Sup. Ct. 1923), affirmed 99 N.J.L. 527 (E. & A. 1924); followed in State v. Ellrich, 10 N.J. 146, 153 (1952). Judged by this standard, we conclude that the several errors in the charge delineated herein so deeply affected defendant's fundamental rights as to require a new trial. R.R. 1:5-1.
Accordingly, the judgment is reversed.
HALPERN, J.C.C. (temporarily assigned) (dissenting).
I travel the same road with the majority insofar as they affirm the actions of the trial court. We part company when they reverse for alleged reversible error in the charge.
In reviewing a court's charge we are guided by the standards in R.R. 1:5-1 which provide, inter alia:
"(a) * * * Error in * * * the charge of the court, * * * or in any other ruling or order made during the course of the trial, shall be cause for reversal if specific objection thereto was made and it appears from the entire record of the proceedings had upon the trial that the defendant thereby suffered manifest wrong or injury. The court may, however, notice plain errors affecting substantial rights of the defendant, although they were not brought to the attention of the trial court. * * *
(b) No judgment given upon any indictment shall be reversed * * * for any error except such as shall have prejudiced the defendant in maintaining his defense upon the merits."
In considering the sufficiency of a charge certain guideposts should be followed. We should not extract and construe a single sentence without regard to the charge as a whole. Since the law of a case cannot be stated in one sentence, the charge must be read as a composite entity in the light of a sensible construction to determine its legal worth. If on *203 the application of these standards it cannot be said that the jury was misled there is no prejudicial error. State v. Smith, 27 N.J. 433 (1958).
The theory upon which this case was tried and a study of the entire record lead me to the conclusion that the defendant suffered no manifest wrong or injury nor was he prejudiced in his defense on the merits.
The defendant contends the court's charge left the jury with no alternative but to convict him. My evaluation of the entire record compels me to conclude that the court's comment on the evidence was not prejudicial. It was strong but fair comment, and the ultimate decision of guilt or innocence was properly left to the jury. State v. Peterson, 10 N.J. 155, 162 (1952).
With respect to that portion of the charge, now alleged to be erroneous, to which the defendant did not object, we are asked to apply the "plain error rule." This rule should be sparingly used, else the philosophy for its existence will be destroyed. It should be applied only when the alleged error affects a defendant's substantial rights and is sufficiently grievous to justify this court in concluding that of itself the error possessed a clear capacity to bring about an unjust result. State v. Corby, 28 N.J. 106 (1958); State v. Lucas, 30 N.J. 37 (1959). This record, in my opinion, does not meet this test.
I would affirm.