253 A.2d 612.
STATE *vs.* LOUIS CONTRERAS *et al.*

MAY 14, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

524

JOSLIN, J. Louis and John Contreras, brothers, were tried and convicted before a judge and jury in the superior court on a joint indictment charging a violation of G. L. 1956, §11-5-5, as amended. Specifically, the charge was that they knowingly and wilfully struck a uniformed member of the Newport police department, causing him bodily injury, and that the officer was then engaged in the performance of his duty. The case is here on the defendants' exceptions to the denials of their motions for directed verdicts and for new trials as well as to various rulings made during the course of the trial.

The essential facts may be briefly stated. At about 1:30 on the morning of August 16, 1966, the two defendants were at or near the corner of Thames and Church Streets in Newport when they were arrested and taken to the police station by officer Burns, a Newport police officer, who was in uniform and on duty. While this much is agreed upon, all other material facts are more or less in dispute. More particularly, there is a dispute as to whether defendant John punched the arresting officer in the chest, whether defendant Louis grabbed him at the shoulder and hit him in the back either with his fists or with a nightstick or with both, and whether the grabbing and those blows or strikings or any of them caused bodily injuries. While each defendant appears to deny striking the officer, they do not seriously question either that the evidence thereon was in substantial conflict or that different minds could naturally and fairly resolve those conflicts differently. For purposes of the directed verdict and the new trial issues, therefore, the alleged strikings may be conceded, and in the light of that concession the nub of the cases is whether or not those strikings caused bodily injuries. Proof thereof was, of course, essential to establishing guilt of the offenses charged, and if defendants are to prevail on either the directed verdict

or the new trial issues, it must be because the state did not prove that any bodily injuries were caused by the strikings.

We look, therefore, to the record in order to ascertain what it discloses concerning bodily injuries. What we find is not very revealing, for the evidence on this question is at best sketchy and sparse, and much of what little that can be found is in conflict. The only sources are in the testimony of the arresting officer himself and in that of Dr. Tan, the physician on duty at the Newport hospital, who examined the officer about two hours after defendants were arrested.

Officer Burns testified that he took defendants to the station house following their arrest. On arrival he told Sergeant Hopkins, the officer in charge, what had happened, prepared a written report of the incidents, and booked the defendants. These events did not necessarily take place in sequence and probably each to some extent overlapped the other. In any event, when all were completed officer Burns went to the Newport hospital for a physical examination. What prompted the visit was an aching back. That condition was noted by the officer in his written report and commented upon by him to Sergeant Hopkins. He said nothing, however, either to the sergeant or in his report about any aches or pains in the chest or in the shoulder, and his only oral or written complaint then, or at any other time, was that his back ached. His explanation for not referring to the chest and shoulder injuries in his report or in his conversation with the sergeant was that he was unaware of them until after his arrival at the hospital when he discovered for the first time that he had four bruises or bang marks on his shoulder and some bruises on his chest. Notwithstanding that discovery, he made no complaint to Dr. Tan about aches or pains in or bruises or injuries to his shoulder or chest, nor did he offer any explanation for not doing so.

Doctor Tan's examination of officer Burns took almost one half an hour. While it included the chest as well as the back, he noted no external evidence of any injury and his only significant finding was that officer Burns exhibited a tenderness when his back was pressed near the spleen and left kidney.

The discrepancy between the injuries about which the officer complained and those which the examining physician noted is such, defendants argue, that common experience dictates that the former should have been disregarded as lacking in probative value. If that had been done, the argument continues, proof of an essential element of the offenses charged, viz., bodily injuries, — would have been lacking and not-guilty verdicts should have been directed.

In a different context defendants' argument might be persuasive because there are cases where the testimony of a lay person must yield to that of the expert. One example is, *Union Smelting and Refining Works* v. *Calhoun,* 101 R. I. 655, 226 A.2d 498, a workmen's compensation case, where an employee felt able to return to his regular work but his physician advised against it. Given that unusual and unlikely evidentiary conflict, we unhesitatingly rejected the worker's testimony as incompetent and lacking in probative force, and we said:

> "A convalescent may have a general sense of well-being and feel that he has fully recovered from his illness or injury, but he can only surmise or guess at his ability to return to any type of work. It is for the expertise of medical science to evaluate his readiness to resume work and it would be foolhardy for anyone recovering from an impairment of health to wager his guess against the opinions of doctors who had examined him. Thus we think that the respondent's testimony as to how he felt lacked competency on the issue of his ability to return to his work." *Id.* at 658, 226 A.2d at 500.

The distinction between that case and this is patent. In *Calhoun* a proper resolution of the issue in doubt called for the exercise of expertise and the issue was therefore better resolved by an expert than by a lay person. Here, ignoring for the moment the back injury as to the existence of which there is no head-on testimonial dispute, the issue was whether the officer's chest and shoulder were bruised. Such bruises, if observable at all, could be observed as well by a lay person as by a trained clinician, and officer Burns was just as qualified as was Dr. Tan to see whether or not his chest was bruised and his shoulder banged. He said that they were and that he saw the bang marks and the bruises when he was at the hospital. Doctor Tan, on the other hand, did not see any external evidence of an injury. Such a direct conflict on an essential issue was not open for resolution on the motions for directed verdicts because on those motions neither the credibility of witnesses nor the weight of their testimony was before the trial justice. *State* v. *Cohen*, 93 R. I. 215, 172 A.2d 737; *State* v. *St. Angelo*, 72 R. I. 412, 52 A.2d 513. Instead, his function was limited to resolving all conflicts in the evidence and to viewing most favorably to the state the evidence and inferences reasonably deducible therefrom. *State* v. *Mantia*, 101 R. I. 367, 223 A.2d 843; *State* v. *Reardon*, 101 R. I. 18, 219 A.2d 767; *State* v. *Poole*, 97 R. I. 215, 197 A.2d 163. It was, therefore, not error to deny the motions for directed verdicts.

When we consider the denials of the motions for new trials, once again the pivotal question is whether there were any "bodily injuries." Here we look initially to the trial justice's decision in order to ascertain whether in the exercise of his independent judgment he considered the material evidence on that question, and whether he passed on its weight and the credibility of the witnesses who testified thereon. His comments are brief. In substance he said only that the jury could have returned guilty verdicts even

though there was no "external evidence of injury."[1]  Obviously, that language refers to the back injury inflicted by Louis, for its sole symptom was a pain rather than a bruise, whereas the shoulder and chest injuries were manifested by bruises and bang marks rather than by aches and pains.

Louis, while he is agreeable to the idea that the trial justice must have been referring to the back injury when he spoke of there being no need for actual evidence of injury, argues nonetheless that the trial justice failed to take into consideration that blows in the back by a nightstick or a fist sufficient to cause pain more than two hours later would also be expected to produce some perceptible symptom or mark.  The difficulty with that argument is that it ignores Dr. Tan's testimony that the officer could have sustained the back injury he complained of even though there were no external marks on his body and that whether or not there would be any bruises would depend "upon the strength and also the reaction of the body."  The jury obviously accepted Dr. Tan's testimony; and the trial justice approved.  That approval will not be disturbed by us unless it is shown either that it is clearly wrong or that the trial justice in reviewing the evidence overlooked or misconceived some which was relevant or material on a controlling issue.  *State* v. *Shilo,* 101 R. I. 533, 225 A.2d 524; *State* v. *Frazier,* 101 R. I. 156, 221 A.2d 468; *State* v. *Ephraim,* 80 R. I. 321, 96 A.2d 641.  Louis failed to show either and it was not error to deny his motion for a new trial.

John's claim that he should have been granted a new trial stands on a different footing.  The trial justice, as we

---

[1]The only reference by the trial justice in his ruling on the motions for new trials to bodily injuries was: "Under the law of this statute, they can find a man guilty of this crime without there being any external evidence of injury. It doesn't say great injury or little injury or any kind of injury, it just says injury. An injury can be sustained without any external marks or signs of it."

have already observed, confined his comments on bodily injuries to the back injury inflicted by Louis. He said nothing at all, however, about the officer's complaint that his chest was bruised even though there was a conflict between that complaint and Dr. Tan's testimony that his examination disclosed no bruises. His failure to refer to that conflict, much less to resolve it, indicates that he completely overlooked the question of bodily injury in John's case.

In circumstances such as these where material evidence has been overlooked by a trial justice in ruling on a motion for a new trial, our duty is to examine the record independently in order to discover for ourselves whether the evidence is sufficient to sustain the conviction. In testing sufficiency, the yardstick we have employed in the past is whether the evidence was "sufficient to prove defendant guilty beyond a reasonable doubt." *State* v. *Frageorgia*, 84 R. I. 30, 34, 121 A.2d 321, 322. See also *State* v. *Casey*, 71 R. I. 30, 41 A.2d 757. To follow that language literally, would cast this court in a role which reviewing courts, for obvious and often repeated reasons traditionally shun — that of weighing testimony and passing on the credibility of witnesses. In order to avoid that role, we must leave to the jury the part of fact-finder and then, perforce, in testing sufficiency we must accept as truthful all competent evidence which, if believed, would support the verdict, and then determine whether that evidence is sufficient to prove a defendant guilty beyond a reasonable doubt. Such a procedure, in addition to involving a departure from a literal reading of the *Frageorgia* language, may also constitute a change in the guideline. That guideline, however, is not inconsonant with the general purposes of *Frageorgia* as those purposes fit within the general scheme of the respective functions of a jury, trial judge and reviewing court, nor is it inconsistent with the practice which generally

prevails elsewhere. Thus for example, in the federal court system the rule is that "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser* v. *United States,* 315 U.S. 60, 80, 62 S. Ct. 457, 469, 86 L. Ed. 680, 704; and in Pennsylvania

"The law is well established that in considering the appeal of a defendant after a verdict or plea of guilty, the test of the sufficiency of the evidence is whether accepting as true all the evidence upon which, if believed, the jury could have properly based its verdict, such evidence is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime charged." *Commonwealth* v. *Gockley,* 411 Pa. 437, 440-441, 192 A.2d 693, 695;

and in our own state prior to 1905 when the common pleas division of this court exercised the jurisdiction presently lodged in the superior court, the rule was that in cases of conflicting evidence a verdict would not be disturbed "except for palpable mistake or misconduct of the jury." *State* v. *Peabody,* 25 R. I. 544, 545, 56 A. 1028, 1029. See also *State* v. *Kline,* 266 Minn. 372, 124 N.W. 2d 416, *cert. denied,* 376 U.S. 962, 84 S.Ct. 1124, 11 L.Ed.2d 980; *Hutchinson* v. *State,* 248 Ind. 226, 225 N.E.2d 828; *State* v. *Hanks,* 252 Wis. 414, 31 N.W.2d 596.

When we look to the record in this case to ascertain whether there is competent evidence upon which the jury could have found that officer Burns sustained a bodily injury as a result of having been struck by John, we find the officer's testimony that his chest was bruised. Obviously, the jury believed that testimony, for, if it had not, it could not have returned a guilty verdict under the charge as given. The defendant argues, however, that officer Burns' statement was uncorroborated, that he never complained of a pain or an ache in his chest, that Dr. Tan did not observe any bruises or marks in the chest area, that the nurse or nurses who were present during Dr. Tan's

examination did not testify, that the police took no photographs showing the alleged bruises, and that there is no testimony in the record which in any way buttresses the officer's testimony that his chest was bruised even though it would have been reasonable to expect that such evidence, if available, would have been offered. Whatever the persuasive force of those arguments, they did not persuade the jurors to whom they were undoubtedly addressed. They elected instead to accept officer Burns' testimony, and that testimony supports the verdict.

In addition to their exceptions to the denials of their motions for directed verdicts and for new trials, defendants, in a shotgun attack, list 102 additional exceptions in their bill. They argue not all, but many; and they include them under three so-called issues, the first of which also included their exceptions to the directed verdict and new trial rulings. Some they discuss at length, and others they merely refer to in passing; some they support with citations of authority, and others go unsupported. Many are so lacking in merit, or so inapposite to the factual context of this case, or so completely without authoritative support as to merit no discussion. Still others relate to testimony objected to when offered but admitted elsewhere in the record without objection and these too require no discussion. We discuss only the remaining exceptions.

First we consider whether Dr. Tan should have been permitted over objection to testify that officer Burns told him that he had been hit on the back.[2] In admitting that

---

[2]"Q. Doctor, will you please describe to the jury the nature of your examination on that evening and your findings?

"A. I examined the pulse rate and the chest examination and the back. He complained—

Mr. Going: Objection. I move to strike that part of his answer 'he complained . . .'

"Mr. Burke: Your Honor, I would submit this is part of the examination.

534

testimony the trial justice appears to have assumed that the key to the admission of those declarations is whether they were part and parcel of the case history. Such an assumption ignores the well-established limitations upon the admission into evidence of statements made by a patient to his physician.

Those limitations recognize that a physician will, as a matter of routine, ask his patient about the development, duration, and symptoms of his ailment or complaint; that he will inquire about what pain and symptoms have been associated with it; and that he will want to know what treatment and remedies have been employed in caring for it. That such inquiries are customarily made in order to obtain what we know as a "case history" does not mean that each of the patient's responses will be admissible as a part of that history, or that it will be rejected as hearsay. The rule is not that simplistic. Instead admission or rejection will hinge on whether what has been related by the patient will assist or is helpful in the diagnosis or treat-

---

"The Court: I think the doctor is entitled to tell what history he may have been given at the time he made the examination. Denied, exception. You may proceed. Ask him to tell the Court what history was given.

"(Defendants' Exception Noted)

"Mr. Burke: Yes, Your Honor.

"Q. Doctor, what history were you given by the patient?

"Mr. Going: Objection.

"The Court: Overruled, exception.

"(Defendants' Exception Noted)

"A. He said that he was hit on the back.

"Mr. Going: Move to strike.

"The Court: Denied, exception.

"(Defendants' Exception Noted)

"Q. Was that the entire history, doctor?

"A. He was complaining of pain. He was hit on the back, that's what he told me, the patient told me.

"Mr. Going: Move to strike.

"The Court: Denied, exception.

"(Defendants' Exception Noted)"

ment of his ailment. If they satisfy that test, then the declarations are admissible; if, however, they consist instead of a narration of details which have no medical connection with either diagnosis or treatment, then they do not meet the test, and they are inadmissible unless they form a part of the res gestae. *Mott* v. *Clarke*, 88 R. I. 257, 146 A.2d 924; *State* v. *Guaraneri*, 59 R. I. 173, 194 A. 589; 6 Wigmore, *Evidence,* (3d ed.) §1722, pp. 74-75; McCormick, *Evidence,* §§266-267, pp. 563-566.

The foregoing general principles, in addition to governing the admission of the patient's declarations to his physician concerning his symptoms and the like, will also control in the admissibility of statements relating either to the cause of his injury or to the circumstances attendant upon its occurrence. Although such statements will more usually than not fall into the inadmissible category, this is not necessarily so because it may and does often happen that what a patient says about what caused his injury or how it occurred will aid his doctor in both his diagnosis and treatment. This, it seems to us, is such a case, because here the examining physician had nothing to go on except the patient's subjective complaint of pain when the doctor pressed his back. His mere complaint of pain without more would have left the door open to endless tests in order to pinpoint the injury and to prescribe a cure. Knowledge that the officer had been hit in the back and that the arrival of the pain coincided with the blow, eliminated the need, at least initially, for those tests, and thereby simplified the diagnostic process. In the circumstances, we can find nothing wrong with allowing Dr. Tan to testify that officer Burns told him as part of the case history that "he was hit on the back."

Another contention is that a new trial should have been ordered because the jury apparently deliberated for only twenty-seven minutes. For a jury to be prompt in arriving

536

at a verdict, however, is not in and of itself a sufficient reason for a new trial. *Rustigian* v. *Molloy,* 95 R. I. 330, 186 A.2d 724; *Cain* v. *Motta,* 92 R. I. 475, 170 A.2d 127; *Mahoney* v. *Smith,* 78 R. I. 56, 78 A.2d 798; *Carrara* v. *Noonan,* 69 R. I. 111, 31 A.2d 424; *O'Connell* v. *Ford,* 58 R. I. 111, 191 A. 501. We see no good reason, nor has any been suggested, why the jury's promptness in reaching a verdict in this case should be treated otherwise. The issues were few in number; simple rather than many and complex; and the only real question was which of the witnesses to believe.

Another assignment of error is that the indictment contained an inaccurate and misleading statement concerning the offenses charged and that it should not, therefore, have been permitted to be taken to the jury room. The short answer is that there is nothing inherently improper in the indictment going to the jury room, *United States* v. *Press,* 336 F.2d 1003, 1016, *cert. denied,* 379 U.S. 965, 85 S. Ct. 658, 13 L. Ed.2d 559; *State* v. *Begyn,* 58 N.J. Super. 185, 195, 156 A.2d 15, 19-20, *aff'd* 34 N.J. 35, 167 A.2d 161; and any claim that the indictment was inaccurate or misleading should more appropriately have been raised in a different manner and at an earlier stage of the proceedings. *State* v. *Mazzarella,* 103 R. I. 253, 236 A.2d 446; *State* v. *Cucca,* 102 R. I. 95, 228 A.2d 572; *State* v. *Douglas,* 78 R. I. 60, 78 A.2d 850.

A further exception is to the manner in which the jury were instructed with respect to the words "wilfully" and "knowingly." Those words are frequently used in the

criminal law and they appear in the statute[3] upon which this indictment was based. Neither, however, has a single, fixed or uniform meaning. *Screws* v. *United States,* 325 U.S. 91, 101, 65 S. Ct. 1031, 1035, 89 L. Ed. 1495, 1502; *Finn* v. *United States,* 256 F.2d 304, 307; *Chow Bing Kew* v. *United States,* 248 F.2d 466, *cert. denied,* 355 U.S. 889, 78 S. Ct. 259, 2 L. Ed.2d 188. Their meanings, moreover, will often vary depending on the context in which used or the offense charged. *Riss & Co.* v. *United States,* 262 F.2d 245, 248; *United States* v. *Perplies,* 165 F.2d 874, 876. Very generally, and without intending either to delve into their precise meanings or to explore the nuances which may differentiate one from the other, it may be said that to act either "knowingly" or "wilfully" is to act voluntarily and intentionally, and not because of mistake or accident or other innocent reason. *Ewell* v. *State,* 207 Md. 288, 114 A.2d 66; *United States* v. *Schneiderman,* 106 F. Supp. 906, 930, *aff'd sub nom., Yates* v. *United States,* 225 F.2d 146, *rev'd on other grounds,* 354 U.S. 298, 77 S. Ct. 1064, 1 L.Ed.2d 1356. And while the word "wilfully" usually will not imply an evil purpose if used in connection with offenses not in themselves wrong or involving moral turpitude, it will be otherwise if the offense involves such turpitude for then it will customarily connote that it has been done with a specific intent to do something which the law forbids, that is to say, with a bad purpose and with the intent either to disobey or to disregard the law. *United States* v. *Murdock,* 290 U.S. 389, 394, 54 S. Ct. 223, 225, 78 L. Ed. 381, 385;

---

[3]G. L. 1956, §11-5-5, as it read at the time of the offense, (P. L. 1966, chap. 188, sec. 1) provided: "Any person who shall knowingly and wilfully strike a uniformed member of the state police, metropolitan park police, conservation officers, state properties patrolman, or city or town police forces causing bodily injury while the member is engaged in the performance of his duty shall be deemed to have committed a felony, and shall be imprisoned not exceeding three (3) years or fined not exceeding fifteen hundred dollars ($1,500.00) or both."

538

*Price* v. *United States*, 165 U. S. 311, 314, 17 S. Ct. 366, 367, 41 L. Ed. 727, 728.

The defendants' complaint, in substance, is that the instructions given in this case with respect to the words "wilfully" and "knowingly" in no way conform to their generally accepted meanings. The trial judge charged as follows:

> "* * * Now, you won't have any trouble with a great deal of this. The statute says, *Section 11-5-5,* that any person who shall knowingly and wilfully strike a uniformed member of a city police force while the member is engaged in the performance of his duty, thereby causing bodily harm to the police force member, is guilty of a crime. Now, you know what knowingly means, he did it knowingly, and doing is a mental state. You never have any direct evidence of the state of a man's mind. You can only judge what the state of the man's mind was by his conduct, by what was there at the scene when he committed these acts and if from all the evidence you conclude that, and are satisfied beyond a reasonable doubt that the striking, if any, was knowingly done, then the State has sustained its burden as to that element.

> "The second one is wilfully, an act of his own free will, wilfully * * *."

Obviously in so instructing he borrowed some, but not too extensively, from the well-accepted meanings of the words. We test what he said, however, not by reading the challenged portion in isolation, but by considering it within the context of the entire charge. *State* v. *Page*, 104 R. I. 323, 244 A.2d 258; *State* v. *Mantia*, 101 R. I. 367, 223 A.2d 843; *State* v. *Cohen*, 93 R. I. 215, 172 A.2d 737. When so read it is apparent that the entire instruction, although perhaps inartistic in the sense that it did not fully and completely explain the words "knowingly" and "wilfully" in conventional language, nonetheless in substance adequately defined them according to the nature of the offenses

charged, and did not mislead the jury. No more was required. *State* v. *Jefferds,* 89 R. I. 272, 152 A.2d 231; *State* v. *Andrews,* 86 R. I. 341, 134 A.2d 425, *cert. denied,* 355 U.S. 898, 78 S. Ct. 274, 2 L. Ed.2d 195, petition for *writ of error coram nobis dismissed,* 96 R. I. 461, 194 A.2d 674.

A still further assignment of error is that the trial justice refused to admit into evidence a written statement of the recollections of a witness who was among the group of sailors with defendants when they were arrested. The witness, who had originally been called by the defendants, was shown the document during re-direct examination. He identified it as one he had prepared; he stated that the events described were fresher in his mind when the document was prepared than they were during his testimony; and he concluded that the statement was a truthful account of the events observed by him on August 16, 1966. Thereupon, defendants offered the writing as an exhibit.

In arguing for its admissibility, defendants either overlook or misconceive the distinction which exists between a recollection of past events which has been refreshed by a reference to a testimonially usable writing previously prepared, and a recollection which, although it once existed, has vanished completely and has been replaced by a written record of that past recollection which the witness is willing to adopt as his present testimony. Speaking to that distinction the Massachusetts court said that a witness may use a writing

"* * * to revive or stimulate a present recollection, or, having no present recollection even with the aid of the writing, he may use it merely as a record of his past knowledge. Professor Wigmore has classified these situations as 'present recollection revived' and 'past recollection recorded' and several courts in recent years have employed these designations. Wigmore on Evidence (3 ed.) §§758, 734. *United States* v. *Riccardi,*

174 Fed. (2d) 883 (C.A.3), and cases therein collected." *Fisher* v. *Swartz,* 333 Mass. 265, 267, 130 N.E.2d 575, 577.

Accepting the Wigmore distinction — and most courts have — it seems clear that irrespective of the classification, the witness may, assuming a prior foundation, refer to the writing. Whether or not the writing itself is admissible, however, is another question. In the case of "past recollection recorded" the witness definitionally will have no independent recollection of what he wrote and, since the writing will in essence be an embodiment of his testimony, he will have used it in testifying as a substitute for any present recollection. When that is the case, the courts will usually permit the document to be read and even to be shown to the jury. Wigmore, *Evidence,* (3d ed.) §§754-755, pp. 97-100; McCormick, *Evidence,* §278, p. 593.

In the case of "present recollection revived," however, the witness will not testify to what appears on the writing, but will instead give his present memory as refreshed by reference to the writing. Because its use will have been to aid and to refresh a memory, rather than as adoptive testimony, there is no reason for permitting the offering party to show the writing to the jury. Wigmore, *supra,* §763, p. 111, McCormick, *supra,* §9, p. 18. This does not mean, however, that the other party may not see it and use it for impeachment purposes. *State* v. *Bradshaw,* 101 R. I. 233, 221 A.2d 815.

In this case the purpose for which the writing was shown to the witness is doubtful. He had already testified at length on direct as well as on cross-examination without resorting to any aids for purpose of refreshing a vanished recollection or a blank memory. Whatever its purpose, it was not a case of "past recollection recorded" and it was, therefore, not error to refuse to permit it to be introduced as an exhibit.

For the reasons indicated, such of the defendants' exceptions as have not been waived because neither briefed nor argued are overruled, and the case is remitted to the superior court for further proceedings.

*Herbert F. DeSimone,* Attorney General, *Luc R. La-Brosse,* Special Assistant Attorney General, for plaintiff.

*Umsted & Going, Joseph B. Going,* for defendants.