STATE

v.

Jeffrey O'BRIEN.

No. 98–261–C.A.

Supreme Court of Rhode Island.

June 29, 2001.

Robert B. Mann, Providence, for Plaintiff.

Aaron L. Weisman, Providence, for Defendant.

Present LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

"Sex, lies, and videotape" are the stuff of

this appeal.[1] A college student arranged to have one of his fraternity brothers hide in the closet of his bedroom at the fraternity house in the wee hours of the morning and secretly videotape him and his girlfriend, who also was a student at the college (hereinafter, the victim), while they were having sex on his bed. While they were romping in the buff, the victim suddenly spied the lens of the video camera peeking out from behind the closet drapes. Needless to say, despite the defendant's attempts to dissuade the victim from investigating further, this video game was over. As a result, both the defendant and his closet cinematographer soon found themselves facing the criminal charges that are the subject of this appeal.

### Facts and Travel

During the early morning hours of May 11, 1996, defendant, Jeffrey O'Brien, a member and resident of the University of Rhode Island's Alpha Epsilon Pi fraternity, informed three of his fraternity brothers, including codefendant Jordan Smith, that the victim would be coming to the fraternity to have sex with him. The brothers asked him whether they could watch. To their evident amazement, defendant responded in the affirmative. He instructed them to retrieve the video camera belonging to another one of their fraternity brothers, and then he installed Smith in the closet of his single room at the fraternity to prepare for the videotaping. Pushing aside clothing and placing a chair in this secret lair, defendant secured Smith in the closet and then closed the closet curtain to conceal him and the video camera from view.

There sat Smith, waiting in the closet for approximately a half hour, until defendant finally reentered his room with the unsuspecting victim in tow. Smith activated the camera when he saw the couple move from defendant's couch onto the bed, where they then began to remove their clothing. The videotaping continued for some time, zooming in and out for close-ups of the activity on the bed. Eventually, the victim lifted up her head during the couple's lovemaking and suddenly observed "a camera lens coming from [the] closet" and a "bluish light coming from the camera itself." She screamed "Oh, my God, somebody is taping us!" The defendant, however, calmly told her that she was crazy, that she was seeing things, that she didn't know what she was talking about, and that he had thought she was "cool." Unpersuaded, the victim wrapped a blanket around herself, repeatedly told defendant that "I saw what I saw," and asked what they were going to do about it. When it became evident that defendant was not going to do anything, the victim herself got off the bed, walked to the closet, and pulled the curtain open. There sat Smith, whom she knew from the fraternity, squatting on a chair with the video camera in his hand. She asked Smith "how [he] could * * * do this," called him "sick," and then asked him for the camera so she could remove the tape from it. But Smith refused to give it to her, so she struggled with him before gaining possession of it, after which Smith left defendant's room.

The victim then told defendant that "we have to get this tape [out of the video camera]." He responded that "You can't get the tape out of that kind of camera." The victim, however, simply pressed the eject button, and the tape plopped right out into her hand. She then asked defendant whether he knew anything about the videotaping in advance. Lying, he responded in the negative. Although she

---

1. See *Sex, Lies And Videotape* (Miramax Films 1989).

was initially suspicious of his answer, his actions—running frantically around the room repeatedly denying any prior knowledge, "crying a bit," grabbing a bottle of whisky and taking a swig, stating that he could not "believe this happened to us," and asking why he "would * * * want [his] white ass on tape"—convinced her of his sincerity. She remained in defendant's room until approximately 5:30 that morning. When she left, defendant scampered upstairs to Smith's room and told him that "he still had sex with [the victim]" but that, as hard as he had tried, he was still unsuccessful in getting the videotape back from her.

Later that morning, at around noon time, the victim was sitting in her room at the apartment she shared with another student, crying to herself about the above-described incident. Her roommate had just returned from her morning job and found the victim bawling away. Eventually, the victim told her roommate about the videotaping. Just as they finished their conversation, Smith appeared at their apartment door. His fraternity brothers had sent him over to retrieve the tape; so when he spoke to the victim, he did so on the pretense of wanting to apologize to her for the events of the previous evening. During their conversation, however, as soon as he glimpsed the videotape on her desk, Smith snatched it and made a mad dash for the door. But before he could get away, both the victim and her roommate grabbed him and managed to retrieve the tape. During their scuffle, however, Smith was able to partially damage the videotape by smashing it against his leg and ripping the tape.

Eventually, Smith left their apartment, but he returned shortly thereafter and spoke again with the two women. During this discussion, he finally told the victim that, notwithstanding defendant's protestations of innocence, defendant in fact knew about the videotaping in advance. And, despite the victim's promise not to confront defendant with this information, she and her roommate wasted little time in marching over to the fraternity house and doing just that. Nevertheless, defendant still continued to deny that he had any previous knowledge of the videotaping and insisted that in any event it was "no big deal." The next day, when the victim returned to the fraternity house, Smith told her that because he had damaged the videotape, she would not be able to do anything about the incident. Undeterred, the victim then contacted a local video shop and arranged for the videotape to be restored and repaired.

Ultimately, both defendant and Smith were indicted for conspiring to unlawfully intercept an oral communication in violation of G.L.1956 § 11-1-6, and for intercepting an oral communication in violation of G.L.1956 (1994 Reenactment) § 11-35-21(a)(1) and (c)(3).[2] Smith pled *nolo contendere* to the charges in the indictment, receiving an eighteen-month suspended and probationary sentence. But defendant opted for a trial before a Superior Court trial justice and a jury, who proceeded to find him guilty on both of the counts charged in the indictment. The court then sentenced defendant to a five-year suspended sentence with a concurrent probationary term. This appeal ensued, in which defendant has proffered a series of alternate takes on the trial justice's rul-

2. Rhode Island's wiretapping statute was modeled after the analogous federal wiretapping statute namely, Title III of the Omnibus Crime Control and Safe Street Act of 1968, Pub.L. No. 90–351, 82 Stat. 212 (later amend- ed and retitled by Title I of the Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, 100 Stat. 1848). *See State v. Ahmadjian*, 438 A.2d 1070, 1080 n. 4 (R.I. 1981).

ings. Below, we screen these arguments, frame-by-frame, and indicate why we leave them on the cutting-room floor.

## I

### Was the video camera's audio recorder an "intercepting device"?

At the close of all the evidence, defendant moved for a judgment of acquittal, arguing that the state had failed to prove that any oral communications between defendant and the victim had been intercepted with an intercepting device, as the applicable wiretapping statute required. A mere recording, he argued, was not an interception. He also objected to the trial justice's failure to instruct the jury that it had to find that defendant had procured an interception of an oral communication through the use of an intercepting device. The trial justice rejected these arguments. On appeal, defendant still contends that an interception of a communication is different from a mere recording of a communication, and that Rhode Island's wiretapping statute does not prohibit the mere surreptitious recording of private oral communications.

Pursuant to Rhode Island's wiretapping statute, § 11–35–21(a), one who "willfully intercepts, attempts to intercept, or procures any other person to intercept or attempt to intercept, any wire or oral communication * * * shall be imprisoned for not more than five (5) years." Under G.L. 1956 (1994 Reenactment) § 12–5.1–1(5), "[t]he term *"intercept"* means to acquire aurally the contents of any wire or oral communications through the use of any intercepting device." (Emphasis added.) An *"intercepting device"* is defined by § 12–5.1–1(6) as "any device or apparatus which can be used to intercept wire or oral communications."[3] (Emphasis added.) *"Oral communications"* are defined by § 12–5.1–1(8) as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying [such] expectation." (Emphasis added.)

The defendant argues that the audio recorder built into the video camera that Smith used was not an "intercepting device" as defined by § 12–5.1–1(5). Therefore, he suggests, he "procure[d] [no] other person to intercept or attempt to intercept, any wire or oral communication" that could have triggered a criminal violation of Rhode Island's wiretapping statute, § 11–35–21. Because the audio recorder was integrated into the video camera, it recorded only what already could be overheard by the hidden cameraman's invited naked ear. And because that audio recorder did not amplify the recorded sounds to make them more audible, defendant argues, it cannot be considered an "intercepting device."[4]

A preliminary draft of the federal wiretapping statute provided that "it shall not be unlawful for a party to any wire or oral communication or a person given prior authority by a party to a communication to intercept such communication." S.Rep.

---

**3.** General Laws 1956 (1994 Reenactment) § 12–5.1–1(6)(A) and (B) exempt certain devices, including extension phones and hearing aids, from the definition of "intercepting device[s]."

**4.** An "intercepting device" that has been integrated into any other equipment remains an "intercepting device," provided the inte-

gration does not affect the functions that cause it to be an "intercepting device" standing alone. *See United States v. Torres,* 751 F.2d 875, 885 (7th Cir.1984) (finding that "the soundtrack of a videotape, no less than a free-standing tape recording, is within the scope of Title III"), *cert. denied,* 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985).

No. 90–1097, at 70 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2182. If this earlier draft had been enacted into law and if the General Assembly had adopted its language without amendment when it enacted Rhode Island's wiretapping statute, then perhaps defendant's theory would rest on firmer ground. But because of Congress's abiding concern about the threat posed by eavesdropping technology to the privacy of individual communications,[5] the Senate amended this earlier version of the statute to render illegal one-party consensual recordings (like the one in this case) when they are intercepted "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act."[6] 114 Cong. Rec. 14694 (1968). The sponsor of the amendment, Senator Hart, explained that the original version of the law left a "gaping hole, which would permit surreptitious monitoring of a conversation by one of the parties to the conversation." *Id.* By prohibiting surreptitious recordings "when the [recording] party acts in any way with an intent to injure the other party to the conversation," Senator Hart believed, the amendment would "respond to a problem that is of very great concern to this country; and in the years ahead, as [intercepting] techniques become more sophisticated." *Id.* Further addressing the increasing threat of technology to the privacy of individual communications, Congress broadly defined the term "intercept-

---

5. The legislative history to that enactment reflects this concern:

 "The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. * * * Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage." S.Rep. No. 90–1097, at 42 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2154.

6. The General Assembly incorporated 18 U.S.C. § 2511(2)(d) verbatim when it enacted G.L.1956 § 11–35–22 in 1969. P.L.1969, ch. 55, § 3. In a later amendment to the federal statute in 1986, Congress deleted the phrase "or for the purpose of committing any other injurious act" from § 2511(2)(d). Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, § 101(b)(2), 100 Stat. 1848, 1850 (1986) (the Privacy Act). The legislative history for that amendment indicates that Congress was concerned that the above-quoted phrase was "overly broad and vague" and that its effect could "chill the exercise of first amendment rights." S.Rep. No. 99–541, at 17 (1986), *reprinted* in 1986 U.S.C.C.A.N. 3555, 3571. The above-quoted phrase, according to the legislative history,

 "places a stumbling block in the path of even the most scrupulous journalists. Many news stories have been brought to light by recording a conversation with the consent of one of on[l]y one of the parties involved—often the journalist himself. Many news stories are embarrassing to someone. The present wording of section 2511(2)(d) not only provides such a person with a right to bring suit, but it also makes the actions of the journalist a potential criminal offense under section 2511, even if the interpretation was made in the ordinary course of responsible news-gathering activities and not for the purpose of committing a criminal act or a tort. Such a threat is inconsistent with the guarantees of the first amendment. Inasmuch as [2511(2)(d) as amended] continues to prohibit interceptions made for the purpose of committing either a crime or a tort (including defamation), the public will be afforded ample protection against improper or unscrupulous interception." *Id.* at 17–18, *reprinted in* 1986 U.S.C.C.A.N. at 3571–72.

 The General Assembly, however, declined to follow the federal amendment in 1999 when it enacted other amendments to § 11–35–21(c)(3), and, thus, it left intact the phrase ("or for the purpose of committing any other injurious act"). P.L.1999, ch. 167.

ing device," "to include *any device* which can be used to intercept wire or oral communications." S.Rep. No. 90–1097, at 66, *reprinted in* 1968 U.S.C.C.A.N at 2178. (Emphasis added.) Except for the extension phones and hearing aids that it exempted from the definition of "intercepting device," Congress explicitly stated that its broad definition of this term "intends to be comprehensive." *Id.* at 66–67, *reprinted in* 1986 U.S.C.C.A.N at 2179. It was this broad definition that the General Assembly used in 1969 when it adopted the language of the federal wiretapping statute and enacted it as state law.

■ In doing so, the General Assembly apparently appreciated the significant difference between a third party merely overhearing private communications and the surreptitious tape recording of that same overheard conversation. Although we may expect individuals with whom we are communicating to hear and even to remember what we are saying (and perhaps how we have said it), we usually do not expect them to acquire surreptitiously an exact audio reproduction of the conversation that they can later replay at will for themselves or for others. Thus, by adopting a broad definition of "intercepting device," the General Assembly apparently intended to protect an individual's expectation of privacy—not only from the technological innovations that increasingly expose our private communications to the

uninvited bionic ear (for example, through wiretapping, sound amplifying, and bugging devices), but also from those unseen devices (such as tape recorders and other hidden transmitters) that make it possible for a consensual participant in private communications to transmit or capture those communications for potential disclosure to yet another uninvited and undisclosed audience.[7] As Chief Justice Rehnquist recently noted:

"In a democratic society privacy of communication is essential if citizens are to think and act creatively and constructively. Fear or suspicion that one's speech is being [secretly] monitored by a stranger [or secretly recorded for an illegal purpose by a malicious 'friend'], even without the reality of such activity, can have a seriously inhibiting effect upon the willingness to voice critical and constructive ideas." *Bartnicki v. Vopper,* 531 U.S. 990, ——, 121 S.Ct. 1753, 1769, 149 L.Ed.2d 787 (2001) (Rehnquist, C.J., dissenting) (quoting President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society* 202 (1967)).

■ Therefore, we agree with those courts that construe the federal and state wiretapping statutes to include a tape recorder or other recording device as an "intercepting device" under applicable wiretap laws.[8] Moreover, the audio por-

---

7. We agree with the United States Court of Appeals for the Fifth Circuit that "an 'acquisition' occurs at the time [a] recording is made"—but *not* at the time of "the replaying of a previously recorded conversation." *United States v. Turk,* 526 F.2d 654, 658 (5th Cir.1976) (finding that "[i]f a person secrets a recorder in a room and thereby records a conversation between two others, an 'acquisition' occurs at the time the recording is made. This acquisition itself might be said to be 'aural' because the contents of the conversa-

tion are preserved in a form which permits the later aural disclosure of the contents.").

8. *See, e.g., Konop v. Hawaiian Airlines, Inc.,* 236 F.3d 1035, 1043 n. 1 (9th Cir.2001) ("If a person secretes a recorder in a room and thereby records a conversation between two others, an 'acquisition' occurs at the time the recording is made."); *Sanders v. Robert Bosch Corp.,* 38 F.3d 736, 740 (4th Cir.1994) ("The recording of a telephone conversation alone constitutes an 'aural * * * acquisition' of that conversation."); *United States v. Wuliger,* 981 F.2d 1497, 1502–03 (6th Cir.1992) ("Noncon-

tion of a video recorder is similarly covered by the scope of the federal and state wiretap statutes.[9]

As the United States District Court for the District of Kansas explained in *Thompson v. Johnson County Community College*, 930 F.Supp. 501, 505 (D.Kan.1996):

"Virtually every circuit that has addressed the issue of silent video surveillance has held that Title I does not prohibit its use. *See United States v. Falls*, 34 F.3d 674, 679 (8th Cir.1994); *United States v. Biasucci*, 786 F.2d 504, 508–09 (2d Cir.1986); *United States v. Torres*, 751 F.2d 875, 879 (7th Cir.1984). Additionally, the Tenth Circuit Court of Appeals in *United States v. Mesa–Rincon*, 911 F.2d 1433, 1436 (10th Cir.1990), held that Title III, the predecessor of Title I, does not prohibit the use of silent video surveillance. *Id.* at 1436.

"On the other hand, the above cited case[s] implicitly imply that video surveillance that includes the capability to record audio conversations would violate Title I. In that situation, the video image captured by the surveillance camera is not what violates Title I. Rather, it is the interception of an oral communication that subjects the interceptor to liability."

In addition, James G. Carr, *The Law of Electronic Surveillance*, § 3.8 at 3–144 (2d ed.1996), explains:

"If * * * law enforcement officers use equipment which records sounds as well as sights, so that spoken communications can be overheard or recorded, Title III will be applicable with reference to the audio portion of the videotape. The conversations are oral communications under § 2510(2), which are intercepted

sensual recordings violate the Act, 18 U.S.C. § 2511(1)(a)."); *Pascale v. Carolina Freight Carriers Corp.*, 898 F.Supp. 276, 279 (D.N.J. 1995) (same); *Lane v. Allstate Insurance Co.*, 114 Nev. 1176, 969 P.2d 938, 940 (1998) ("The taping of a telephone conversation is clearly the aural acquisition of the contents of a wire communication through the use of a mechanical device."); *State v. Ahmadjian*, 438 A.2d 1070, 1079–81 (R.I.1981) (impliedly recognizing that non-participant recording of a telephone conversation is subject to "the requirements of chapter 5.1 [of title 12 of the Rhode Island General Laws]"); *State v. Murphy*, 113 R.I. 565, 577 n. 3, 323 A.2d 561, 567 n. 3 (1974) (same).

9. *See, e.g., United States v. Jackson*, 213 F.3d 1269, 1279–81 (10th Cir.2000), *judgment vacated on other grounds, Jackson v. United States*, 531 U.S. 1033, 121 S.Ct. 621, 148 L.Ed.2d 531 (2000) (assuming that the audio component of a video recorder is subject to Title III); *Williams v. Poulos*, 11 F.3d 271, 280 (1st Cir.1993) (a monitoring device consisting of " 'alligator clips attached to a microphone cable at one end' and an 'interface connecting [a] microphone cable to a VCR and a video camera' on the other * * * is

precisely the type of intercepting device Congress intended to regulate heavily when it enacted Title III"); *Torres*, 751 F.2d at 885 ("[T]he soundtrack of a videotape, no less than a free-standing tape recording, is within the scope of Title III."); *United States v. Haimowitz*, 725 F.2d 1561, 1581–82 (11th Cir. 1984) (assuming that the audio component of a video recorder is subject to Title III); *Audenreid v. Circuit City Stores, Inc.*, 97 F.Supp.2d 660, 663 (E.D.Pa.2000) (since "the evidence produced by the parties clearly demonstrates that the video camera which had been installed in the plaintiff's office recorded no sound and that the videotape created by that camera shows only the movements of the people in that office," there was no violation of the federal or Pennsylvania wiretap acts); *United States v. Grice*, 37 F.Supp.2d 428, 429–30, 432 (D.S.C.1998) (same); *cf. Ages Group, L.P. v. Raytheon Aircraft Co.*, 22 F.Supp.2d 1310 (M.D.Ala.1998) (recognizing that since videotaping may have included oral as well as video component, summary judgment was appropriate); *State v. Howard*, 728 A.2d 1178 (Del.Super.Ct.1998) (recognizing that the audio component of a video recorder is subject to "Delaware's Wiretap Statute, which parallels the federal wiretap statute").

by the audio component of the video camera, and are regulated accordingly."

Thus, we disagree with those federal courts that have narrowly interpreted the broad language of the federal wiretapping statute by holding that "the recording of a conversation is immaterial when the overhearing is itself legal" and that "[a] recording device placed next to, or connected with, a telephone receiver *cannot* itself be the 'acquiring' mechanism." *United States v. Harpel*, 493 F.2d 346, 350 (10th Cir. 1974).[10] Some federal courts, however, *are* apparently willing to classify a tape recorder, connected to a telephone, as an "interception device" when the tape recorder does more than just passively listen and "but for the recording device" the communication would not have been intercepted.[11]

Under Rhode Island's wiretapping statute, § 11–35–21, a person may have every legal right to hear or participate in an oral communication (either because he or she is a party to the communication or has been invited by one participant to overhear the conversation), but still violate the law by surreptitiously tape recording those same communications (but only if the taping is "for the purpose of committing any criminal or tortious act in the violation of the constitution or laws of the United States or of any state or for the purpose of committing any other injurious act"). Thus, we hold, the definition of "intercepting device" as adopted by the General Assembly in 1969 (which was in effect when defendant asked his fraternity brother to videotape his intimate relations with the victim) was certainly broad enough to encompass the use of a videotape recorder, a device "which can be used to intercept wire or oral communications." Section 12–5.1–1(6).

**10.** *See also Epps v. St. Mary's Hospital of Athens, Inc.*, 802 F.2d 412, 415 (11th Cir. 1986) (holding that the interception device was not the equipment used to record the conversation but the dispatch console to which the recorder was attached); *Anonymous v. Anonymous*, 558 F.2d 677, 679 (2d Cir.1977) (holding that the "fact that appellee here taped the conversations which he permissibly overheard, we find, as the Fifth Circuit did [in *Simpson v. Simpson*, 490 F.2d 803, 809 (5th Cir.1974)], to be a distinction without a difference"); *United States v. Cheely*, 814 F.Supp. 1430, 1441 (D.Alaska 1992) (holding that "Title III only proscribes unlawful interceptions defined as listening or monitoring of telephone conversations, not the recording of monitored conversations; hence if monitoring is lawful, recording is always lawful").

**11.** *E.g., United States v. Murdock*, 63 F.3d 1391, 1394–95 (6th Cir.1995) (holding that a recorder connected to an extension phone which was activated automatically when the extension phone handset was lifted was an "interception device," where "[t]here was no evidence that the recorder could have operated independently of the telephone"); *see also*

*Sanders*, 38 F.3d at 740 n. 8 (holding that a voice logger, connected to telephone extensions and capable of automatically recording communications on those extensions, was an "interception device" because " '[t]he calls would not have been heard or otherwise acquired—that is, intercepted—at all but for the recording device' "); *Deal v. Spears*, 980 F.2d 1153, 1158 (8th Cir.1992) (holding same as *Murdock*).

In at least one federal decision, the court appeared to embrace the idea that a simple tape recorder could qualify as an "interception device." *United States v. Shields*, 675 F.2d 1152, 1154–56 (11th Cir.1982). In *Shields*, the FBI provided an informant with two pieces of equipment: a simple tape recorder and a separate radio transmitter, to both record on tape and to transmit the sounds for monitoring and recording elsewhere. *Id.* at 1154. The informant in turn gave the equipment to an associate who used it to tape conversations with yet another associate. *Id.* The court found that, pursuant to the definition of "intercept," "each communication in question was intercepted twice" (once by the transmitter and once by the tape recorder). *Id.* at 1156.

Therefore, in determining whether there has been an "interception," we do not end our analysis as defendant urges us to do, by concluding, as a matter of law that a videotape camera (or an ordinary tape recorder), cannot qualify as an "intercepting device." Such a construction, we believe, would be contrary to the broad definition of "interception" in the statute. We are persuaded that a broad interpretation of "intercepting device" gives effect to the General Assembly's evident desire to protect individuals from "*any* device or apparatus" that might be used then or in the future to invade their privacy.

▆▆ Finally, defendant argues that because the "simple 'unadulterated' [video] camera," used in this case was like the "ordinary, unadulterated AM radio," used by the police to overhear private cordless telephone conversations in *State v. Delaurier,* 488 A.2d 688, 694–95 (R.I.1985), we should hold, as the *Delaurier* Court did, that there was no "intercepting device" and thus no violation of the federal wiretapping statute. In *Delaurier,* this Court stated that "[w]e do not believe that Congress intended to include within the meaning of 'device' an ordinary, unadulterated AM radio." *Id.* at 694. But "listening to an AM broadcast, put on the air voluntarily, and accessible to anyone possessing an ordinary AM radio," *id.,* is fundamentally different from listening to the sound track

of a videotape, taken from a secret video camera that was hidden in a closet in someone's bedroom. Such a videotape recording was not "put on the air voluntarily" nor was it as accessible as an AM broadcast to anyone possessing an ordinary video camera or recorder. Moreover, the *Delaurier* Court interpreted the federal wiretapping statute (not Rhode Island's wiretapping statute). *Delaurier* based its holding on federal judicial decisions indicating that an "unadulterated AM radio" would not have been considered an "intercepting device" under federal law. *Id.*[12] But here we are construing state law and not the federal statute at issue in *Delaurier.* Thus, we disagree with defendant that *Delaurier* is controlling in this case. However much we may look for guidance to cases interpreting federal wiretapping law, we are not bound to follow either federal or even our own decisions interpreting the *federal* wiretapping statute when we interpret Rhode Island's wiretapping statute, especially when we disagree with the reasoning or analysis used in such cases. Further, the device used there to intercept the private oral communications at issue was not secreted within earshot of those communications. Thus, the placement and use of the device did not invade the parties' expected zone of privacy. In sum, even if Congress did not intend to include

12. The basis of *Delaurier's* suggestion of a narrow definition for an "intercepting device" under federal law is not even clear in light of that case's single citation to a law review note supporting this result. There, a commentator merely recommends such an interpretation "in the *absence* of a contrary expression of intent by Congress." *The United States Courts of Appeals: 1973–74 Term Criminal Law and Procedure,* 63 Geo.L.J. 331, 351 (1974). (Emphasis added.) The note writer of that article suggested that "the most logical way" to prevent the criminalization of the "innocent practice of monitoring mobile telephone bands and ship-to-shore frequencies * * * would be to find that a radio receiver used to intercept the radio portion of a wire communication, voluntarily broadcast by one of the parties thereto, is not a 'device' within the meaning of title III." *Id.* According to the commentator, "[a]lthough Congress could best correct this deficiency in title III [by more narrowly defining an 'intercepting device'], courts should act in the interim." *Id.* But we strongly disagree with the commentator's suggestion that courts should ignore plain and unambiguous statutory language to achieve a different result "in the interim" than the one apparently intended by the Legislature in enacting that language into law.

AM radios as an "intercepting device," such an exclusion lends no support to the argument that the General Assembly did not intend a video camera to fall within this definition.

Finally, this Court has indicated that Rhode Island's wiretapping statute would be interpreted more strictly than its federal counterpart in "the interest of giving the full measure of protection to an individual's privacy." *State v. Maloof,* 114 R.I. 380, 390, 333 A.2d 676, 681 (1975) (holding that the warrants relied upon by the police to authorize their eavesdropping activities were invalid because they allowed interceptions that exceeded the duration allowed by law). In *Maloof,* we noted:

> "In the interest of giving the full measure of protection to an individual's privacy, particularly as it relates to electronic eavesdropping, *we shall insist upon a closer adherence to the Rhode Island statute than may be expected by those who interpret the federal legislation. In so doing, we give added meaning to the state's constitutional guarantee of privacy.*" *Id.* (Emphasis added.)

Therefore, we hold that the videotape recorder used in this case was, as a matter of state law, an "interception device" and, therefore, the trial justice did not err in rejecting defendant's arguments, objections, and motions to the contrary.

## II

**Did the court fail to properly instruct the jury with respect to the definitions of "intercept" and "intercepting device"?**

■ The defendant argues that by failing to include the statutory definition of "intercept" in the jury instructions, the trial justice committed reversible error because, without this definition, the jury could not possibly decide whether the state proved beyond a reasonable doubt that defendant was one "[w]ho willfully *intercepts,* attempts to *intercept,* or procures any other person to *intercept* or attempt to *intercept,* any wire or oral communication." Section 11–35–21(a)(1). (Emphases added.) After the trial justice instructed the jury and before the jury retired to deliberate, defendant objected: "Judge, you did not instruct them that the State has to prove that there was an interception and that the term intercept means to acquire aurally the contents of any oral communication through the use of any intercepting device." In addition to his objection that the trial justice failed to give a general definition of "intercept," defendant also objected to the fact that no definition was given for the term "intercepting device." [13] The trial justice "noted" these objections but refused to issue any curative or additional instruction. In a pretrial decision responding to defendant's motion *in limine* to exclude the videotape from admission into evidence, the trial justice ruled that the audio recorder in the video camera was "the acquiring mechanism which intercepted the oral communications between the parties."

■ The state has the burden of proving every element of a crime beyond a reasonable doubt. *See State v. Mora,* 618 A.2d 1275, 1280 (R.I.1993) ("When the state prosecutes a defendant, it carries the burden of proving every element necessary to the charge beyond a reasonable doubt, even if some of those elements may not be disputed."). In this case, the trial justice "read[ ] the statute [under which defen-

---

**13.** The defendant, however, failed to object to the fact that the trial justice never defined the term "oral communication."

dant was charged] and * * * attempt[ed] to summarize the elements in his own words." *State v. Durfee,* 666 A.2d 407, 409 (R.I.1995) (holding that "this court has long approved" of the practice by which a trial justice "read[s] the statute and * * * attempt[s] to summarize the elements in his own words").

Merely by failing in the jury instructions to incorporate the statutory definitions of the terms "intercept" (meaning to "acquire aurally the contents of any wire or oral communication through the use of any intercepting device") and "intercepting device," the trial justice did not commit reversible error in this case. For the reasons discussed above, the video camera was an "intercepting device" as a matter of law and its use (as revealed in the playback of the videotape to the jury) indisputably "acquire[d] aurally" the surrounding sounds and communications captured on the videotape. *See Pascale v. Carolina Freight Carriers Corp.,* 898 F.Supp. 276, 279 (D.N.J.1995) (holding that the question of whether the defendants' recording device was an "intercepting device" was "a question of law appropriate for summary judgment"). Moreover, the trial justice read § 11–35–21(a) to the jury verbatim, instructing the jurors that one who "willfully intercepts, attempts to intercept, or procures any other person to intercept or attempt to intercept, any wire or oral communication" is guilty of this crime. He also carefully instructed the jurors that the defendant could not be convicted of this crime unless there was an interception of an "oral communication." Thereafter, the jury found defendant guilty of violat-

ing § 11–35–21(a). In doing so, the jury necessarily found that an oral communication had been intercepted; that is, "acquired aurally * * * through the use of [an] intercepting device." *See State v. Hazard,* 745 A.2d 748, 753 (R.I.2000) (holding that "when the jury finds facts that 'are "so closely related" to the omitted element "that no rational jury could find those facts without also finding" the omitted element,' this exercise amounts to the functional equivalent of the omitted element").

Here, as the trial justice ruled *in limine,* the video camera was an "intercepting device" as a matter of law. And in this case the sound recorder in the camera was indisputably used to "acquire aurally" intimate communications between defendant and the victim. Moreover, the trial justice instructed the jury about the "oral communication" element of the crime by reading to the jurors the operative language from § 11–35–21(a) (which includes "oral communication" as an element). He also attempted to explain in his own words what this statute prohibited.[14] As a result, we conclude, the jury "render[ed] a 'complete verdict' on every element of the crime." *Hazard,* 745 A.2d at 752–53 (quoting *Neder v. United States,* 527 U.S. 1, 11–15, 119 S.Ct. 1827, 1835–36, 144 L.Ed.2d 35, 49–50 (1999) (applying a harmless-error analysis to cases in which a jury could not render a finding on an actual element of the offense because they were not properly instructed by the trial justice)). Therefore, we hold, the trial justice's failure to read to the jury the statutory definitions of "intercept" and

---

**14.** In his instructions to the jury, the trial justice repeatedly stressed that, to render a guilty verdict, the jury would have to find that the defendant had caused an interception of private "oral communication[s]" between defendant and the victim. For example, in his initial instructions to the jury before trial, he emphasized: "The statute, under which this defendant has been charged, is limited to oral communications." Thereafter, when he instructed the jury before it retired to deliberate, he reemphasized: "It is oral communication that is an issue in this case."

"intercepting device" was not reversible error.

## III

### Did the court fail to properly instruct the jury on the definition of "willfully"?

Section 11–35–21(a)(1) imposes criminal sanctions only on one who *"willfully* intercepts, attempts to intercept, or procures any other person to intercept or attempt to intercept, any wire or oral communication." (Emphasis added.) The defendant proposed two alternate definitions for "willfully" to be included in the instructions to the jury:

(1) "[W]illfully means to act or participate voluntarily and intentionally, and with specific intent to do something the law forbids, or with specific intent to fail to do something the law requires to be done; that is to say, to act or participate with the bad purpose, either to disobey or to disregard the law."

(2) "Willful is to mean done with a bad purpose, without justifiable excuse, or stubbornly, obstinately, or perversely."

The trial justice refused to charge the jury using either one of these proposed alternate definitions. Instead, he instructed the jury that "[w]illfully and knowingly means to act voluntarily and intentionally, and not because of a mistake or accident or other innocent reason." [15]

In doing so, he relied upon the definition of "willfully" that this Court articulated in *State v. Lima,* 113 R.I. 6, 9, 316 A.2d 501,

503 (1974) ("to act voluntarily and intentionally, and not because of mistake or accident or other innocent reason") (quoting *State v. Contreras,* 105 R.I. 523, 537, 253 A.2d 612, 620 (1969), *superseded by rule as stated, State v. Mastracchio,* 546 A.2d 165, 172 (R.I.1988)). The trial justice instructed the jury as follows with respect to § 11–35–21(a)(1)'s provision that the charged "interception" be "willful":

"What does willful mean? Our State has defined it, our State Supreme Court has defined it, in a number of cases as the following: Willfully and knowingly means to act voluntarily and intentionally, and not because of a mistake or accident or other innocent reason. So, to be willful, this defendant had to act voluntarily and intentionally, and not through a mistake or accident or other innocent reason."

The defendant argues that the trial justice committed reversible error by failing to define "willfully" in accordance with Congress' intent in enacting the federal wiretapping statute. He posits that "willfully" means something more than merely "intentional." In support of his contention, defendant refers to the legislative history of Title III, which cites to *United States v. Murdock,* 290 U.S. 389, 396, 54 S.Ct. 223, 226, 78 L.Ed. 381, 386 (1933), and which states rather laconically that "[a] violation of [§ 2511] must be willful to be criminal." S.Rep. No. 90–1097, at 93, *reprinted in* 1968 U.S.C.C.A.N. at 2181. The citation in the federal legislative history to *Murdock,* however, is not particularly

---

**15.** Perhaps to clarify its original intent, Congress passed The Electronic Communications Privacy Act of 1986 (ECPA) which amended the criminal provisions of Title III (18 U.S.C.A. §§ 2511, 2512) by changing the state of mind a prosecutor must prove from "willfully" to "intentionally." The Senate Judiciary Committee report on ECPA noted:

"[P]eople who steal because they like to or to get money or to feed the poor, like Robin Hood, all commit the same crime. * * * The word 'intentional' describes the mental attitude associated with an act that is being done on purpose. It does not suggest that the act was committed for a particular evil purpose." S.Rep. No. 99–541, at 24, *reprinted in* 1986 U.S.C.C.A.N. at 3578.

helpful because, rather than providing a definition for "willfully," *Murdock* simply provides a list of possible meanings for this word before concluding that "[a]id in arriving at the meaning of the word 'willfully' may be afforded by the context in which it is used." [16] *Murdock*, 290 U.S. at 395, 398, 54 S.Ct. at 226, 226, 78 L.Ed. at 385, 387 (holding that in the context of the criminal tax statute in question, "willfully" meant "prompted by bad faith or evil intent"); *see also State v. Contreras*, 105 R.I. 523, 537, 253 A.2d 612, 620 (1969) (following *Murdock*, but interpreting "willful" in a state criminal statute to mean "intentional").

■ Despite this unhelpful legislative history to the federal wiretapping statute and its ambiguous reference to *Murdock*, many federal courts have agreed with defendant that the word "willfully" in the federal wiretapping statute means something more than "intentionally." [17] Nevertheless, we disagree that this interpretation should apply to Rhode Island's wiretapping statute, and hold, as did the Federal District Court in *Kratz v. Kratz*, 477 F.Supp. 463, 478 (E.D.Pa.1979), that "the authors of the Senate Report could not have cited *Murdock* out of a desire to implant in 'willfully some element of "bad

16. "The word often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal statute, it generally means an act done with a bad purpose * * *; without justifiable excuse * * *; stubbornly, obstinately, perversely, * * *. The word is also employed to characterize a thing done without ground for believing it is lawful * * *, or conduct marked by careless disregard whether or not one has the right so to act * * *." *United States v. Murdock*, 290 U.S. 389, 394–95, 54 S.Ct. 223, 225, 78 L.Ed. 381, 385 (1933). Thus, *Murdock* merely alludes to three possible definitions of "willfully" and the frequency with which these definitions have been used in various contexts ("willfully" is *"often"* defined as intentional, *"generally"* defined as "with a bad purpose" when used in a criminal statute, and *"also"* defined as knowingly breaking the law). But *Murdock* does not mandate the use of any one of these specific definitions in interpreting Rhode Island's wiretapping statute. On the contrary, *Murdock* instructs that "[a]id in arriving at the meaning of the word 'willfully' may be afforded by the context in which it is used." *Id.* at 395, 54 S.Ct. at 226, 78 L.Ed. at 385. And we do not construe this to mean that if the word "willfully" appears in the context of a criminal statute, then it *must* be defined as "done with a bad purpose." Rather, we hold that *Murdock* stands for the proposition that the definition of "willfully" should be consistent within the context of the statute itself; in other words, it should be consistent with the legislative intent of the statute con-

strued as a whole and in the context of the overall purpose of the law.

17. *See, e.g., Adams v. Sumner*, 39 F.3d 933, 934 (9th Cir.1994) (finding that before 1986, "willfully" meant " 'done with a bad purpose [or] without justifiable excuse,' " or " 'stubbornly, obstinately, or perversely' "); *Malouche v. JH Management Co.*, 839 F.2d 1024, 1026 (4th Cir.1988) ("appellant was required to establish an intentional or reckless disregard of its legal obligations by appellee"); *Farroni v. Farroni*, 862 F.2d 109, 112 (6th Cir.1988) ("For purposes of section 2511, a person acts 'willfully' if he knowingly or recklessly disregards a known legal duty."); *Citron v. Citron*, 722 F.2d 14, 16–17 (2d Cir. 1983) (" 'liability under Title III-be it civil or criminal-cannot be established against any defendant without showing that he acted with intentional or reckless disregard of his legal obligations' "); *United States v. Ross*, 713 F.2d 389, 391 (8th Cir.1983) ("Congress intended 'willfully' to mean *more than* intentional. * * * For interception or disclosure of a wire communication to be a crime, it must be done 'with a bad purpose * * * without justifiable excuse, * * * stubbornly, obstinately [or] perversely.' ") (quoting *Murdock*, 290 U.S. at 394–95, 54 S.Ct. at 225, 78 L.Ed. at 385); *Earley v. Smoot*, 846 F.Supp. 451, 452 (D.Md.1994) (finding that 18 U.S.C. § 2511(1) was amended in 1986 to dilute the standard of proof from willfulness to mere intentional conduct, after holding that the willfulness standard required proof of knowledge of the unlawfulness of the interception).

faith" or "evil intent." ' " Concluding that to define "willfully" as an "intentional violation of the law" would "emasculate the statute," the *Kratz* court held that "the one definition of [willfully] which gives effect to the language and purpose of Title III * * * is 'intentionally.' " *Id.* at 479. Because we agree with this reasoning, we hold that "intentional" is the proper definition of the term "willful" as used in § 11–35–21(a).

Moreover, defendant's proposed definition would make little sense in the context of interpreting Rhode Island's wiretapping statute. If individuals willfully intercept oral communications "with a bad purpose" or "without ground for believing it is lawful," then even if they had one party's consent to the intercept, they still would be criminally liable because, by intercepting "willfully," they would have intercepted the communication "for the purpose of" committing a crime (wiretapping) or "for the purpose of" furthering some other "bad purpose," such as a tort or "*any* other injurious act." In other words, defendant's definition of "willfully" would render the statutory conditions on one-party consensual interceptions redundant. Under this interpretation, a willful interception would always be criminal, with or without one-party consent. But by providing specifically that an interception of an oral communication with one party's consent would be lawful if it was merely willful, but unlawful if it was accomplished "for the purpose of committing any criminal or tortious act in the violation of the constitution or laws of the United States or of any state or for the purpose of committing any other injurious act," Congress and the General Assembly clearly intended that "willfully" should mean merely "intentional."

We also note that the General Assembly enacted Rhode Island's version of the federal wiretapping statute in 1969. This enactment preceded the various rulings of those federal courts who have rendered a different interpretation of what it means to intercept "willfully." Thus, we hold that when the General Assembly enacted Rhode Island's wiretapping statute it adopted the definition of "willfully" that Congress most likely intended to use in enacting 18 U.S.C.A. § 2511; that is, the one that the trial justice used in his jury instructions: "[w]illfully and knowingly means to act voluntarily and intentionally, and not because of a mistake or accident or other innocent reason."

■ But even if the brief *Murdock* reference in the legislative history to the federal wiretapping law might support a different definition of "willfully," we still would hold that the next alternate definition from *Murdock* that most likely would apply is the one it found to be "generally" used with criminal statutes: namely, "done with a bad purpose * * * without justifiable excuse * * * stubbornly, obstinately, perversely." *Murdock*, 290 U.S. at 395, 54 S.Ct. at 226, 78 L.Ed. at 385. Here, defendant's own testimony clearly showed that he asked Smith to videotape the sexual activity between the victim and himself "with a bad purpose * * * without justifiable excuse * * * stubbornly, obstinately, [or] perversely." The defendant testified that he intentionally directed his fraternity brother Smith to secretly videotape his intimate sexual relations with the victim while Smith hid in the bedroom closet "because [defendant] didn't believe that she would be a willing participant [to the taping]." The defendant participated in this scheme despite the fact that he believed "that sexual activity between two consenting people is something that's entitled to be private," and that he would be "angry" and "upset" if what he did to the victim had been done to him.

Therefore, we hold that, even if we were to read the cryptic reference to *Murdock* in the federal wiretapping law's legislative history as imposing a "bad purpose" definition of "willfully" upon Rhode Island's wiretapping statute—and we decline to do so—the trial justice's refusal to give defendant's proffered instructions would have amounted to no more than harmless error in the context of this case because defendant clearly acted with such a bad purpose in doing what he did.

## IV

### Did the Court Improperly Fail to Instruct the Jury on the Definition of "for the purpose of"?

 The defendant next argues that the trial justice committed reversible error by misinterpreting § 11–35–21(c)(3) and instructing the jury:

"So even if you have two people involved in the [interception], which is what is alleged here, and one of them has given consent to the intercept, that person who has given consent to the intercept could still be guilty of this crime *if [he] violated* * * * this woman's privacy." (Emphasis added.)

Section 11–35–21(c)(3) provides:

"It shall not be unlawful under this chapter for:

* * *

"A person not acting under color of law to intercept a wire or oral communication, where the person is a party to the communication, or one of the parties to the communication has given prior consent to the interception unless that communication is *intercepted for the purpose of* committing any criminal or tortious act in the violation of the constitution or laws of the United States or of any state or for the purpose of commit-

ting any other injurious act." (Emphasis added.)

Before closing arguments, defendant objected to the trial justice's failure in his jury instructions to distinguish between committing a tort and acting "for the purpose of" committing a tort. He then proposed a curative instruction: "I would ask that you instruct the jury that the State must further prove that the interception, attempted interception, or procurement of another to intercept or attempt to intercept the oral communication was *for the purpose of invading the privacy* of [the victim]." (Emphasis added.) The trial justice rejected this proposal and issued no new instruction.

In *State v. Dellatore*, 761 A.2d 226, 230 (R.I.2000), we held:

"A trial justice 'shall instruct the jury in the law relating to the action.' G.L. 1956 § 8–2–38; *see State v. Arpin*, 122 R.I. 643, 666, 410 A.2d 1340, 1352 (1980); *State v. Butler*, 107 R.I. 489, 490, 268 A.2d 433, 434 (1970); *Macaruso v. Massart*, 96 R.I. 168, 172, 190 A.2d 14, 16 (1963). However, a 'trial justice is free to instruct the jury in his or her own words, provided that he or she states the applicable law.' *State v. Parkhurst*, 706 A.2d 412, 418 (R.I.1998) (citing *State v. Marini*, 638 A.2d 507, 517 (R.I.1994)). '[I]t is not reversible error for a trial justice to refuse to give instructions requested by a defendant, as long as the charge given adequately covers the law relating to the request.' *State v. Grundy*, 582 A.2d 1166, 1170 (R.I.1990). On appeal, this Court reviews a challenged instruction in the context of the entire charge to determine how a jury composed of ordinarily intelligent people would have understood the instructions as a whole. *See State v. Cipriano*, 430 A.2d 1258, 1262 (R.I.1981). If the Court determines that a reasonable juror

would not have misconstrued the instructions, then the trial justice's instructions will be upheld. *See id.; see also Parkhurst,* 706 A.2d at 418."

In summarizing § 11–35–21(c)(3), the trial justice failed to distinguish between committing a tort and acting "for the purpose of" committing a tort. Nevertheless, "in the context of the entire charge," we hold that "a reasonable juror would not have misconstrued the instructions." *Dellatore,* 761 A.2d at 230. In fact, immediately after instructing the jury that the above-quoted consent exception to § 11–35–21(c)(3) would not apply in cases in which the person responsible for the interception violated the victim's privacy (rather than in cases in which the person causing the interception of a communication has done so for the purpose of violating the victim's privacy), the trial justice emphasized to the jury that "the State must show that this was a willful violation." Because we read "willful" to mean "intentional" in the context of Rhode Island's wiretapping statute, and because, in this context, intentional is functionally equivalent to "for the purpose of," we hold that the trial justice's concluding remark clarified his previous statement by injecting into the instruction the correct reading of the law: that the communication must be intercepted willfully, that is, intentionally or "for the purpose of" committing a criminal, tortious, or any other injurious act.

Moreover, we are further assured that "a jury composed of ordinarily intelligent people would have understood the instructions as a whole" because of the fact that these instructions came on the heels of a correct verbatim reading by the trial justice of the statute itself, one that expressly included the "for the purpose of" language that is in question here. *Id.* Therefore, we hold that, after considering the instructions in their entirety, the trial justice's refusal to give the "for the purpose of" instruction requested by defendant did not constitute reversible error.

## V

## Did the Court Err by Admitting Into Evidence the Video Portion of the Tape?

 The defendant next contends that the trial justice should not have permitted the jury to view the videotape he directed Smith to record showing him having sexual relations with the victim, because "[w]hatever probative value the video possessed was outweighed by its prejudicial effect." Moreover, defendant contends, because he was being charged only with an illicit act of audio interception (§ 11–35–21 does not prohibit video interceptions), only the audio portion of the videotape should have been entered into evidence. Because of the grave risk that the jury would find the video portion of the recording so offensive that it would convict him for engaging in conduct that, by itself, was not criminal (namely, arranging for the video portion of the recording to occur), defendant insists that the trial justice erred in allowing the jury to watch the video portion of the recording. The trial justice denied both defendant's motion *in limine* to exclude the video portion of the recording and his objections at trial to the showing of the videotape. Although he correctly found that the state's wiretapping statute did not cover the video portion of the tape recording, the trial justice concluded that it did cover the audio portion and that the state had to prove that the interception occurred for the purpose of violating the victim's privacy. Thus, "exercising [his] discretion under Rules 403 and 404 [of the Rhode Island Rules of Evidence]," he ruled that the probative value of showing the videotape recording to the jury out-

weighed any potential prejudice (especially in light of the cautionary instruction the court gave to the jury, emphasizing that the recording of the video portion of the tape was not itself criminally actionable).[18]

The role of this Court on appeal is "to review the record and to determine whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice." *State v. Bettencourt*, 723 A.2d 1101, 1108 (R.I.1999). Rule 403 of the Rhode Island Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *." We have held that "the ultimate determination of the effect of the evidence is within the trial justice's discretion," *State v. Grundy*, 582 A.2d 1166, 1172 (R.I.1990), and that "[u]nless evidence is of limited or marginal relevance and enormously prejudicial, the trial justice should not act to exclude it." *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1193 (R.I. 1994). In addition, with respect to highly prejudicial crime-scene photographs or pictures of murder victims, this Court has consistently held that "when such evidence is probative, the trial court's admission of explicit photographs is not an abuse of discretion and will not be disturbed on appeal." *Hughes v. State*, 656 A.2d 971, 972 (R.I.1995). "By their very nature, crime-scene photographs or pictures of murder victims may unsettle or even horrify the viewer, yet this Court has recognized that because it is the state's burden to prove each element of a crime beyond a reasonable doubt, such photographs are

unquestionably relevant to its need to do so." *State v. Carter*, 744 A.2d 839, 847 (R.I.2000). Thus, the test for determining the admissibility of visual images like the videotape recording at issue here does not gauge their ghastliness or lubricity, but instead asks whether they will " 'inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt.' " *State v. Ellis*, 619 A.2d 418, 424 (R.I.1993). "Indeed, only when such evidence is offered *solely* to inflame the passions of the jury should a photograph" or other visual images of a crime victim be excluded. *Carter*, 744 A.2d at 847.

We agree with the trial justice and the state that the probative value of the videotape (including the video portion) outweighed its potential prejudice to defendant. The state had the burden under § 11–35–21(c)(3) of proving to the jury that the communications in question were "intercepted for the purpose of committing [a] * * * tortious act" (in this case, an invasion of the victim's right to privacy under G.L.1956 § 9–1–28.1, as amended by P.L.1980, ch. 403, § 1). Therefore, it was necessary for the jury to view the videotape so that it could determine whether in fact the defendant had intercepted the communications between the victim and himself for the purpose of violating the victim's right to privacy. Viewing the interception, as well as hearing it, undoubtedly would have helped the jury to decide whether the interception was intended to be "an invasion of something that is entitled to be private or would be expected to be private" and whether that "invasion [would be] offensive or objectionable to a

---

**18.** The trial justice admonished the jury:

"Now, you are to see a video, and the video has some oral communication on it. I admonish you that in your deliberations in this case you are not to consider the visual portion of this recording. The statute, under which this defendant has been charged, is limited to oral communications. Allegedly by the State, the video is a means of procuring or attempting to procure the intercept."

reasonable [person]." *See* § 9–1–28.1(a)(1)(i)(A) and (B). Moreover, we agree with the state that the video portion of the tape was especially probative in this case because of defendant's denial that he "willfully" intercepted the oral communications contained on the audio portion of the tape. Watching and listening to the tape, the jury surely would have noted that Smith continued to record the sounds and communications of his subjects' sexual encounter, even when he was forced to retreat behind the closet drape to avoid the victim's spotting him while she and defendant were sporting on the bed. This portion of the tape was probative of both Smith's and defendant's intent to intercept the audio—as well as the video aspects of the events in question—because even when the cameraman could not capture the visual images, he still kept the tape rolling, thereby capturing the oral communications between the lovers while filming only the dark inside of the closet's drapery.

Therefore, because the videotape contained probative evidence that both Smith and defendant "willfully" intercepted the audio portion of the tape "for the purpose of committing [a] * * * tortious act," and because the tape was not so shocking as to "inflame the jury [to the point where they would be] unable to weigh the evidence and reach a verdict in a rational and thoughtful manner," *Carter*, 744 A.2d at 848, we hold that the trial justice properly admitted the videotape into evidence because the "probative value [of the video tape was *not*] substantially outweighed by the danger of unfair prejudice." R.I. R. Evid. 403.

## VI

### Did the Court Err in Denying the Motion for Judgment of Acquittal?

At the close of evidence, defendant moved for a judgment of acquittal. Even construing the evidence in the light most favorable to the state, he asserted that the state had failed to prove beyond a reasonable doubt that defendant and Smith had (1) intentionally intercepted the audio portion of the tape, (2) intercepted it "for the purpose of" violating the victim's privacy, (3) acted "willfully" and (4) conspired to intercept the audio portion of the tape.

Although it is true that defendant never admitted to knowing about the audio capabilities of the video camera, we do not believe that this omission was fatal to the state's case. Judging from the videotape itself (which was available for the jury to view as a full exhibit), the jury could infer that the camera and its capabilities were well known to the members of the fraternity and that, by requesting that it be used, defendant knew and appreciated that its ordinary use would include the recording of sounds audible to the cameraman. The main feature of the videotape that was the subject of this case appeared at the end of a long series of vignettes in which the camera recorded the images and sounds of life at defendant's fraternity house. The videotape included scenes from a "slip and slide" party at the fraternity, multiple scenes of numerous persons in various rooms of the fraternity house smoking suspicious substances, and various walk-around scenes (down halls and into and through rooms). Sound existed throughout the footage, and the stars of these mini-dramas all spoke to the camera or at least seemed to be aware that it was recording not only their images, but also their voices. Viewing the intimate and familiar interactions between this camera and the residents of defendant's fraternity house in the light most favorable to the state, a reasonable jury could conclude that defendant directed his fraternity

brothers to "get *the* video camera" to record his tryst with the victim knowing that this particular video camera, like others of its type, would capture sounds as well as images. Despite defense counsel's best efforts to elicit testimony from Smith that he did not intend to record the sounds, Smith seemed almost amused by this preposterous suggestion:

"Q: And you never even thought about recording their voices did you?

"A: I just assumed I pushed play and everything would turn out like a regular videotape does.

\* \* \*

"Q: Right. When you set up a camera of two people who are nude getting involved in sex, you don't think about recording their voices, do you?

"A: Usually the voices come out.

\* \* \*

"Q: Do you know how the recording device even worked?

"A: Audio? I've used the camera before. It's worked before.

\* \* \*

"Q: It records what you hear, right?

"A: It records whatever you hear in the room."

Given the evidence that this camera was known to the brothers in the fraternity house, that defendant asked for it to be used in this case, that defendant's co-conspirator knew it recorded sound, and that, as a matter of common knowledge, it would be unusual, if not impractical, as of the date of this recording to use a video camera that contained no audio capabilities, we hold that, construing the evidence in the light most favorable to the state, the jury could conclude beyond a reasonable doubt that defendant intended for Smith to intercept both the audio and video portions of the tape.

Likewise, we conclude there was sufficient evidence to indicate that defendant ordered the interception "for the purpose of" violating the victim's privacy. The defendant admitted that the victim would not consent to the tape recording. He even testified that he would be "angry" and "upset" if anyone surreptitiously recorded him having sexual relations. Finally, he acknowledged that a person's intimate sexual relations are entitled to privacy and that an invasion of that privacy would be "offensive or objectionable to a reasonable man." Nevertheless, having testified that he believed that the victim had a subjective and objectively reasonable expectation of privacy and that its invasion would be "offensive and objectionable to a reasonable man," defendant carried out his scheme anyway and caused the victim to be videotaped without her knowledge or consent while having sex with him.

In addition, because we agree with defendant that "the conspiracy charge rises and falls on the substantive charge," we hold that the evidence was sufficient to convict him of conspiracy. Finally, because we have held that "willfully," in the context of Rhode Island's wiretapping statute, merely means intentionally, we conclude, as we did above, that there was sufficient evidence to convict defendant as one "[w]ho willfully intercepts, attempts to intercept, or procures any other person to intercept or attempt to intercept, any wire or oral communication." Section 11–35–21(a)(1). In short, the court did not err by denying the motion for judgment of acquittal.

## VII

### Did the Court Commit Reversible Error Because of Its Reasonable Doubt Instruction?

According to defendant, the trial justice's use of a scale to define proof beyond

a reasonable doubt misleadingly quantified this applicable standard of proof. The trial justice instructed the jury:

"I just happen to have a *scale* here. Are they about equal? In a civil case the moving party or petitioner must prove the case by a fair preponderance of the evidence. Remember I told you that the scale just has to tilt ever so slightly for the plaintiff to prevail? But this is a criminal case where the burden is greater[;] beyond a reasonable doubt. The scale must go down significantly more, but not all the way. It's not beyond all doubt, or you would have the scale touch the bench. That's not the standard. It's not beyond all doubt. It's beyond a reasonable doubt." (Emphasis added.)

Attempts to quantify reasonable doubt in this fashion have met with strong disapproval by some courts. *E.g., United States v. Anglada,* 524 F.2d 296, 300 (2d Cir.1975) (explaining that, while not reversible error, "characterization of the standard as quantitative rather than qualitative * * * might better have been omitted"); *United States v. Clay,* 476 F.2d 1211, 1215 (9th Cir.1973) (disapproving of any reference to balancing test in reasonable doubt instruction). Agreeing with the United States Supreme Court that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury," *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150, 167 (1954), various federal courts "consider it improper for either trial attorneys or the district court to elaborate on the meaning of reasonable doubt because the term is not susceptible of precise definition and explanations often are confusing to the jury." *United States v. Pungitore,* 910 F.2d 1084, 1145 n. 87 (3d Cir.1990).

■ Given the tremendous stakes involved when convicting the accused of a crime, we agree that it is appropriate to instruct the jury that a reasonable doubt is one that "would make a reasonable person hesitate to act in regard to some transaction of importance and seriousness." *United States v. Munson,* 819 F.2d 337, 346 (1st Cir.1987).

■ Although we agree that the "beyond a reasonable doubt" standard cannot be reduced to a single percentage figure to represent the likelihood that a defendant is guilty, it is still true, as the trial justice instructed the jury, that if the level of certainty needed to convict were subject to quantification the figure would be appreciably greater than 50 percent but still less than 100 percent. Here, the trial justice merely defined the range, by stating that "[t]he scale must go down significantly more [than 50 percent], but not all the way."

■ Yet, although we conclude that the trial justice did not commit reversible error in giving this instruction, use of a scale metaphor, even if it is invoked merely to define a range, may misleadingly tend to quantify the reasonable-doubt standard by suggesting that, within a certain range, a single percentage figure exists beyond which the jury would have to conclude that they were convinced of a defendant's guilt beyond a reasonable doubt. Therefore, we hold that although the trial justice did not commit reversible error by adverting to the scale metaphor in defining reasonable doubt to the jury, his "characterization of the standard as quantitative rather than qualitative * * * might better have been omitted." *Anglada,* 524 F.2d at 300.

■ In addition to his objection to the scale metaphor, defendant also submits that "viewed as a whole the instruction on reasonable doubt unconstitutionally diminished the burden on the state to prove the defendant guilty beyond a reasonable

doubt." The trial justice instructed the jury before closing arguments:

> "If, based on your consideration of the evidence, you are convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you think there is a *real possibility* that he [defendant] is not guilty, you must give him the benefit of the doubt and find him not guilty. That's a different way of saying what I told you yesterday in the definition of beyond a reasonable doubt." (Emphasis added.)

By suggesting to the jury that defendant could be found not guilty only if there was a "real possibility" that he was not guilty, instead of correctly instructing that defendant could be found guilty only if the state proved beyond a reasonable doubt that he was guilty, defendant contends that the trial justice's instruction "impermissibly reduced the state's burden [of proof]."

Yet, as we held in *State v. Saluter*, 715 A.2d 1250 (R.I.1998), "[a]lthough we think that [the 'real possibility of innocence' language] might possibly engender some confusion as to the burden of proof if it stood by itself," we will not deem this instruction to constitute reversible error when it is clear that the charge read as a whole was "sufficient to dispel any possible confusion or misunderstanding arising from the reasonable doubt definition." *Id.* at 1257 (quoting *United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.), cert. denied, 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984)). At the inception of trial, the trial justice admonished the jury:

> "[T]he defendant * * * is presumed innocent. Presumed innocent until a jury should find that the State has met its burden beyond a reasonable doubt and has proven each and every element of the crime charged. Do you understand

the concept? Does anyone have a problem with that?

> "The burden is always on the State. It never shifts to the defendant. The defendant needn't do anything; doesn't have to testify, doesn't have to present evidence, doesn't have to present witnesses. The entire burden remains on the State. The State has the burden to prove its case, in this case two counts, and the elements contained therein, * * * beyond a reasonable doubt. Not beyond all doubt. Beyond a reasonable doubt."

The trial justice further charged the jury before its deliberations:

> "Remember, the burden is on the prosecution at all times throughout the trial to prove guilt beyond a reasonable doubt by credible evidence. That burden never shifts to the defendant. * * * Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt."

Given these repeated references to the correct reasonable doubt standard throughout the trial, we hold that the charge, read as a whole, was "sufficient to dispel any possible confusion or misunderstanding arising from the reasonable doubt definition," *id.*, notwithstanding the court's potentially misleading use of the "real possibility" phrasing at one point in the charge.

## VIII

### Did the Court Err by Failing to Give the Theory of Defense Instruction?

■ Finally, defendant argues that the trial justice should have instructed the jury concerning his "theory of defense": namely, that (1) he did not intend for his fraternity brother to videotape the oral communications between himself and the

victim and (2) he did not intend to violate the victim's privacy. According to defendant, it was the trial justice who should have given this theory-of-defense instruction because the state had the burden of proving defendant's guilt beyond a reasonable doubt and defendant himself did not have any burden at all to prove his theory of innocence.

We have held, however, that a trial justice has no obligation to outline the defendant's theory of defense in the instructions to the jury, because it "is best left * * * to counsel for the defense * * * [who] is in the best position to set forth what he perceives to be the theory of defense in his or her final argument." *State v. Marrapese*, 583 A.2d 537, 546 (R.I.1990). Here, defendant had a full and fair opportunity to argue his theory of defense to the jury and he took full advantage of it, contending that he was interested only in the visual portion of the tape and that he never intended to violate the victim's privacy.

Therefore, we hold that the trial justice did not err by refusing to instruct the jury on the defendant's theory of defense.

### Conclusion

We close the curtain on the defendant's misbegotten cinema verité. Having considered all the defendant's remaining arguments, we conclude that they are without merit. For these reasons, we deny the defendant's appeal and affirm the judgment of conviction.

Chief Justice WILLIAMS did not participate.