Filed 10/16/13  P. v. Hoagland CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LAWRENCE HOAGLAND,<br><br>    Defendant and Appellant. | D062138<br><br><br><br>(Super. Ct. No. SCE305010DV) |


APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

Lizabeth Weis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

Lawrence Hoagland appeals from a judgment convicting him of attempted premeditated murder and other offenses based on evidence showing that he tried to kill his wife by planting a pipe bomb that exploded in her car. He argues the judgment must be reversed because (1) the jury's finding that he was the perpetrator was based on speculation, and (2) his counsel provided ineffective representation by failing to object to closing arguments by the prosecutor that misstated the beyond-a-reasonable-doubt standard. We reject his contentions of reversible error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Around 4:30 p.m. on September 23, 2010, Connie Hoagland (Connie) was severely injured when a pipe bomb inside her truck exploded as she turned on the ignition. Several days after the explosion, defendant was arrested. At trial, the prosecution's witnesses included Connie; a woman living in Pennsylvania with whom defendant was having an affair (Lee Ann Rupert); defendant's business partner (James Coit); and several other witnesses who had information relevant to the investigation of the offense.

At the time of the crime, defendant and Connie had been married for 25 years. They were living in the family home with their two adult daughters, their high-school-age son, and their three-year-old grandson. In the months before the crime, defendant and Connie were experiencing serious financial problems, and in early 2010 they filed for

2

bankruptcy.[1]  During this time period, their relationship was "distant."  Connie suspected defendant was having an affair, but when she confronted him about this he assured her that he was committed to their relationship.[2]

On the morning of September 8, 2010 (about two weeks before the explosion), Connie drove defendant to the airport for a flight to Pennsylvania for a purported business trip.  That evening, as she was driving home in her truck from an errand, she had to take a detour because the street she had driven on en route to her errand was blocked off, and there were numerous police and fire personnel there.  The police had evacuated the area after several individuals observed a pipe bomb in the street.  The bomb consisted of a pipe affixed to a piece of cardboard in a Federal Express envelope with a cell phone attached.  Before the police arrived, bystanders on the street saw cars drive over the bomb.  When the police viewed the bomb, the envelope was "roughed up," and an alligator clip apparently used in the bomb was lying in the street.  The police rendered the bomb safe with a robot, and determined the bomb was designed to explode when a person called the cell phone attached to the bomb.  There were pieces of duct tape with loose

---

[1]     Connie and defendant had about $75,000 in credit card debt, a student loan, a business loan, hospital bills, and an "upside down" mortgage (i.e., their mortgage debt was about $100,000 higher than the value of their house).  Defendant's business partner Coit testified their business was not doing well in 2010, and after the pipe bomb explosion Coit learned the business owed about $40,000 in back rent.

[2]     Connie testified that defendant was working late and not arriving home in time for their family dinner; he was using his phone a lot in a secretive manner; and he was frequently traveling on what he claimed were business trips to Pennsylvania.  Defendant did not appear to care about saving the house, although he "went along" with Connie's efforts to try to structure the bankruptcy so they could keep the house.  Defendant was acting "very short" and would at times get "really mad" at family members.

ends on the bomb. After the subsequent September 23 bomb explosion in Connie's truck, the authorities examined the exterior underside of her truck and found what appeared to be a duct tape residue mark in the area of the driver's side floorboard.

A few days before the September 23 explosion, Connie noticed a black wire hanging down underneath the steering column of her truck. She meant to tell defendant about this, but the wire was later gone and she forgot about it. On the morning of the explosion, Connie again noticed a wire hanging from the steering column when she got in the truck with her son, and she asked her son to remind her to tell defendant about it. When she arrived at work that morning, she locked the truck with the remote "chirper" device. At the end of her work day shortly after 4:00 p.m., defendant called her and said he would be home at 5:30 p.m. Connie perceived this call as odd because she usually had to call him to ask if she should eat dinner without him.

When Connie went out to her truck, she pressed the remote device to unlock it. She noticed the truck appeared to be unlocked already because the remote device did not make the sound it typically makes at unlocking. Connie was the primary driver of the truck, but defendant had access to an extra truck key and he occasionally drove the truck.[3] When Connie started the ignition, the pipe bomb attached inside her vehicle exploded. Connie felt "excruciating pain" in her feet and legs. A bystander helped her out of the truck and called 911.

---

[3]    In addition to Connie's key, there was an extra key in a drawer at the house. The truck could also be opened by punching in a code (known only to the immediate family) on a keypad by the driver's side door.

4

Based on their forensic investigation, the authorities concluded that someone built a pipe bomb and wired the truck for the bomb, at some point placed the bomb in the driver's side dashboard area of the truck, and on the day of the explosion connected the wire to a fuse. When Connie turned on the vehicle's ignition, the circuit was complete and the bomb exploded.

As a result of the explosion, Connie incurred extensive injuries to her feet and lower legs, including serious lacerations, tissue avulsions, and exposed bones. She underwent numerous surgeries and was unable to walk for a substantial period of time. At the time of trial about one and one-half years later, she had extensive scarring; a rod in her foot and one in her tibia; permanent nerve damage to her foot; and toes that did not bend. Also, her hearing was affected and she tired easily.

Based on a variety of evidentiary items acquired during their investigation, the authorities concluded that defendant was responsible for the September 8 pipe bomb found in his neighborhood and the September 23 pipe bomb that exploded in his wife's truck. An AT&T cell phone attached to the September 8 bomb (the "bomb phone") showed that on September 7 between 8:36 and 9:44 p.m. there were 18 incoming missed calls from a Verizon cell phone (the "calling phone"). Both the bomb phone and the calling phone were prepaid phones for which there was no subscriber record. The calling phone was activated on September 5 and the bomb phone was activated on September 6. In defendant's wallet, the police found a paper from AT&T setting forth the phone number for the bomb phone, and a paper from Verizon setting forth the phone number for

5

the calling phone.[4]  The September 7 phone calls from the calling phone to the bomb phone were transmitted via Verizon and AT& T cell phone towers located about two to five blocks from defendant's place of business.[5]  Also, at about 9:00 p.m. on September 7, defendant made a call from his personal AT&T cell phone, and the call was transmitted from the same AT&T cell phone tower near his work.

Defendant and his business partner Coit owned a commercial photography business and were the only persons who worked at their studio.  Coit was concerned that defendant might have been involved in the September 23 explosion.[6]  Coit looked at the browser history on their business computer and discovered that on the morning of September 3 there were 22 searches for YouTube videos related to building pipe bombs, including a cell phone activated bomb.  Coit and defendant were the only persons who used this computer.  Coit contacted the authorities, and shortly thereafter defendant was arrested.  When the authorities examined defendant's home computer, they found a

---

[4]     In addition to the phone numbers associated with the phones, the papers from AT&T and Verizon contained additional information pertinent to the phones.  The AT&T paper stated " 'activate your go phone directly from handset' " and provided an activation code.  The Verizon paper was labeled " 'wallet card' " for a "prepaid wireless phone by Verizon," and contained a space for an account security code and voicemail password (with the handwritten code "1987").

[5]     Defendant's place of business and his residence with Connie were located in different parts of town.

[6]     Coit suspected that defendant might be having an affair with someone in Pennsylvania because defendant made numerous trips there; defendant started having long, private cell phone conversations while at work; and Coit saw on the business's computer an e-mail indicating that defendant was looking for work in Pennsylvania and an e-mail with a picture of Rupert and her children at the beach.

backup for his iPad showing searches on the night of September 3 entitled " 'cell phone detonator' " and " 'make mobile phone bomb.' "

The pipe bomb that exploded in Connie's truck included alligator clips among its components. The authorities contacted numerous stores in San Diego County to determine whether they carried the type of alligator clips found among the exploded bomb debris, and the only store that sold them was Fry's Electronics. Defendant's bank records showed that on September 21 (two days before the pipe bomb explosion), he purchased several items with his debit card at Fry's Electronics. Fry's Electronics records showed that about one minute before defendant's debit card purchase, a person paid cash for alligator clips from the same cashier at the same cash register.

Called to testify on behalf of the prosecution, Rupert (who had been defendant's high school girlfriend) acknowledged that she had been having an affair with defendant since 2007. In about 2009, defendant told Rupert that he was going to leave his wife, file for divorce, and move to Pennsylvania. However, he kept delaying implementation of these plans and making excuses, and Rupert began questioning him about his commitment to her and gave him numerous ultimatums. Defendant kept promising Rupert that he loved her and wanted a life with her, and at one point he told her (falsely) that he had moved out of the family home and served his wife with divorce papers. They made plans for him to move to Pennsylvania in October 2010.

However, in the summer of 2010 there was "a lot of stress" in their relationship. In a series of text messages, Rupert told defendant another man was interested in her; she was tired of his whining, insecurities, and excuses; he needed a divorce and a job in

7

Pennsylvania before making the move to Pennsylvania; and the reality of the situation was that he really could not afford to divorce his wife. At one point she told him they should go their "separate ways."

Whenever Rupert questioned defendant's commitment or tried to end their relationship, defendant continued to pursue her. He sent text messages saying he was completely and totally consumed with making their relationship happen; he wanted more than anything to be her husband; she was worth anything and everything and he just wanted "it to all go away"; he did not have a future without her; he did not have much of a home life and everyone hated him; it was almost over and he would not leave her hanging forever; and he could never go back to his wife and did not love his wife at all. Rupert decided to give defendant another chance.

When defendant was with Rupert in Pennsylvania from September 8 to 17, he had a job interview. After the job interview, defendant and Rupert had a "huge argument" because she felt he was not being straightforward with her about whether he got the job. Rupert suggested they should " 'just take a break' " in their relationship. When defendant returned to California, he continued to send Rupert text messages. On September 21, he texted " 'Going to go to Fry's. Love you, miss you." On September 22, he wrote " 'My life and our life is almost how I want it. Now things are moving faster and picking up speed. . . . [¶] . . . [¶] . . . The start of the life I have wanted and needed and waited for is very real.' "

Starting at 6:15 a.m. on September 23 (the day of the explosion), defendant texted Rupert 25 to 30 times, telling her that he loved her. After the explosion in Connie's truck

8

on that date, he sent Rupert a series of text messages about the incident, and Rupert eventually texted him, " 'Don't worry about us. You need to take care of your family.' " On September 25 and 26, he sent her texts telling her that he loved her and wanted to be in Pennsylvania. Rupert, however, texted him that they should "take a break." Defendant responded that he did not like that idea but he understood; he was very confident in their love and "life forever"; and she may get a call from detectives.

Defendant and Connie had a life insurance policy that would pay $300,000 to the surviving spouse upon the death of the other spouse. Shortly after his arrest, defendant spoke to Connie on the phone. He told her that he wanted her to know he was having an affair " 'before it gets out' "; however, he had " 'been dedicated to [her] since Thursday' " (the day of the explosion); and he " 'didn't do it.' "

*Defense*

Testifying on his own behalf, defendant denied that he was the person who accessed the bomb-making websites on his and Coit's business computer on the morning of September 3; denied that he called the cell phone numbers on the papers in his wallet; and denied that he had anything to do with the pipe bombs. He claimed the cell phone numbers were given to him by a transient named Jerry who, with defendant's permission, had parked his motor home behind the photography studio in exchange for guarding the studio at night. When defendant spoke with Jerry and asked him to "watch out for the place," Jerry gave defendant the two cell phone numbers, one belonging to Jerry and the other to Jerry's wife. Defendant admitted that on September 21 he purchased alligator clips from Fry's Electronics using cash. He claimed he was going to use the clips to

9

construct a static electricity ground while installing memory on a work computer, and he used cash with the plan to reimburse himself from his business's petty cash fund. Defendant also admitted that on the night of September 3 he did Internet searches on his home iPad related to making bombs. He claimed he did this after watching a television show called " 'Burn Notice' " because he wanted to look up if something on the show was actually feasible.

### Jury Verdict and Sentence

For the September 8 bomb incident, the jury convicted defendant of possession or attempting to explode a destructive device with intent to injure. For the September 23 bomb explosion, the jury convicted him of premeditated attempted murder, exploding a destructive device with intent to murder, and exploding a destructive device that causes mayhem or great bodily injury. The jury also found true several enhancement allegations of personal infliction of great bodily injury under circumstances involving domestic violence and personal use of a deadly or dangerous weapon. The court sentenced defendant to an indeterminate life term with the possibility of parole, plus a 13-year determinate term.

### DISCUSSION

### I. *Sufficiency of the Evidence*

Challenging the sufficiency of the evidence, defendant argues the jury's conclusion that he was responsible for the pipe bombs was based on speculation. He posits that although the evidence could raise a suspicion of his guilt, it did not show his guilt beyond a reasonable doubt.

10

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) The same standard applies when the prosecution relies primarily on circumstantial evidence. (*Ibid.*) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid.*) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Ibid.*) It is the exclusive province of the jury to determine credibility and to resolve evidentiary conflicts and inconsistencies. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) However, the jury may not draw inferences based on suspicion; rather, a " ' "finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence . . . ." ' " (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1416-1417, citations omitted.)

The jury could reasonably conclude that the evidence showed beyond a reasonable doubt that defendant was the person responsible for the pipe bombs. The evidence showed that on September 3 defendant's business computer and his personal iPad were used to conduct numerous Internet searches related to bomb making and denotation. Defendant's wallet contained the phone numbers for both the calling phone and the bomb phone that were associated with the September 8 bomb found in the street in defendant's neighborhood. There were repeated calls from the calling phone to the bomb phone on

the evening of September 7 from an area of town located near defendant's business. Defendant used his personal phone to make a call from this same area during the same one-hour period as the calls from the calling phone. Defendant left for Pennsylvania the following morning (September 8), and the pipe bomb was found that night on a street that shortly before had been traversed by the victim when driving in her neighborhood en route to an errand. On September 21, defendant went to Fry's Electronics and used cash to purchase alligator clips. Alligator clips of the same type and sold locally only by Fry's Electronics were found in the debris of the September 23 bomb that exploded in Connie's truck.

As to motive, the record shows defendant was trying to arrange his financial and personal affairs so he could leave his wife and move to Pennsylvania to be with Rupert. Rupert was pressuring him to complete this process; at one point she questioned whether he could financially afford to make the change; and she had suggested they end their relationship. Defendant insisted to Rupert he could arrange his affairs in California and move to Pennsylvania, and he had at his disposal a $300,000 life insurance policy payable to him if his wife died.

From this evidence, the jury could reasonably deduce that defendant was desperate for money and freedom from his marriage so he could be with Rupert; he was afraid of losing Rupert because of the repeated delays in his efforts to extricate himself from his family obligations; and in September 2010 he devised a plan to kill his wife, collect the insurance money, and achieve his goal of moving to Pennsylvania. The evidence tying defendant to the two bombs was strong. Numerous Internet searches on bomb making

12

were found on his computers. Of particularly compelling significance, he was found in possession of the cell phone numbers uniquely associated with the September 8 bomb. The calls associated with these cell phones were made the night before defendant left town to visit his girlfriend, from a location near defendant's place of business, and close in time and location to a call made from defendant's personal cell phone. The jury could reasonably deduce that defendant attached the September 8 bomb to the underside of his wife's truck, arranged to detonate it with the cell phones, and then left town with the intent of having an alibi upon its explosion. Further, after defendant failed in his efforts with respect to the September 8 bomb, he continued with his plan by planting the September 23 bomb. Buttressing this conclusion, two days before the September 23 bomb exploded, defendant made a cash purchase of a component used in this second bomb.

In his briefing on appeal, defendant cites testimony from prosecution witnesses showing that a resident of the neighborhood where the explosion occurred gave the authorities a home surveillance video depicting a man who was carrying a bag and walking down the street about one-half hour before the explosion. When Connie, two of defendant's children, and defendant's business partner Coit were shown the video, they

thought the man had characteristics that made him look similar to defendant.[7] The authorities later assessed that the man was not defendant.[8] This evidentiary item does not defeat the support for the jury's verdict. The fact that a man other than defendant was walking in the area carrying a bag shortly before the explosion did not, standing alone, require the jury to conclude defendant's guilt was not proven beyond a reasonable doubt. As set forth above, there was compelling evidence tying defendant to the bombs.

There is substantial evidence to support the jury's finding that defendant was the person responsible for the pipe bombs.

---

[7] According to the witness testimony, the video of the man (which was shown to the jury) was "a couple of seconds" long and "kind of grainy." An investigating detective testified that the identifications of the man in the video were not based on his facial features, because the man's face was not clearly visible in the video. Connie was shown the video six days after the explosion while she was in the hospital. She told the authorities the video depicted "the back of [defendant]." At trial, Connie testified that she viewed the video when she was "in the hospital with drugs and just kind of out of it a little bit." The man in the video "had a bag" that he was "shoving over his shoulder" which "looked like [something defendant] had done a lot of times with his camera bag." Because the video depicted a man who had defendant's mannerisms, she told the detective she was "100 percent sure." One of defendant's daughters said the man had "the same walking mannerisms" as defendant; i.e., "kind of slouched over." Another daughter said the man was wearing black boots like defendant wears. Coit thought the man had the same distinctive walk as defendant. Defendant's son did not think the man looked similar to his father, and he thought the person "looked more like a high school ball player."

[8] Defendant was ruled out as being the man in the video based on information acquired from cell phone records.

14

II. *Prosecutor's Closing Argument Reference to Puzzle To Describe Burden of Proof*

Defendant argues he was not provided effective representation because his counsel failed to object to closing argument statements by the prosecutor that diluted the prosecution's duty to prove guilt beyond a reasonable doubt.

During rebuttal closing arguments, the prosecutor said:

"I don't want to oversimplify the burden of proof. It's a high burden. And it's a high burden for obvious reasons. We're all aware of them. But at the same time, I would like to use an analogy of what a trial is. Imagine— I don't know how many witnesses, 30 witnesses, come in, swear to tell the truth, sit down, start answering questions for both the prosecution and the defense. *Each question and answer is a piece of the puzzle. They're handing you pieces of the puzzle*.

"Your job at that point is to collect those pieces of the puzzle and when you get back to the deliberation room, you're going to sit down and you're going to talk about all these pieces of the puzzle and you're going to figure out which pieces fit in the puzzle and which ones do not. *If you think a piece fits, you keep it on the table. If you think a piece doesn't fit, you get rid of it. When you have the pieces that do fit, you put them together*.

"You weren't witnesses to this. No one has every answer to every question. *However, if when you finish putting together the pieces that you can and you all collectively stand back and you look at the work we've done, you can see it. If you can see even with pieces missing a picture of what happened and equally what didn't happen, you're there*." (Italics added.)

Defendant asserts the prosecutor's puzzle analogy improperly suggested that the verdict could be based on speculation because it "allowed the jury to look at pieces of a puzzle and speculate about the missing pieces to imagine the completed picture."

It is improper for the prosecutor to misstate the law, and particularly to misstate the prosecution's burden of proof, in closing arguments to the jury. (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1266.) The test for evaluating the propriety of the prosecutor's statements to the jury is whether there is a reasonable likelihood the

15

jury construed the statements in an objectionable manner.  (*People v. Pierce* (2009) 172 Cal.App.4th 567, 572.)  When defense counsel fails to object to a prosecutor's misstatements and a timely admonition from the court would have cured the harm, the issue is forfeited on appeal.  (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1006-1007.)  However, the claim may be considered under an ineffective representation theory.  (*Id.* at p. 1007.)  To show ineffective representation, the defendant must establish that counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that absent counsel's deficiency the result would have been different.  (*Ibid.*)  If the record does not show prejudice from counsel's alleged deficiency, we may reject the claim without determining whether counsel's performance was deficient.  (*Id.* at p. 1008.)

The crux of the beyond-a-reasonable-doubt standard is that the jury must have " 'an abiding conviction' " that the defendant is guilty.  (Pen. Code, § 1096[9]; *People v. Pierce, supra*, 172 Cal.App.4th at p. 573.)  An abiding conviction has been described as one that is settled and fixed, or lasting and permanent.  (*Pierce, supra*, at p. 573.)  However, the jury need not eliminate every iota of doubt (even if unreasonable), because given the limits on human knowledge, there can always be some possible or imaginary doubt.  (Pen. Code, § 1096; *Victor v. Nebraska* (1994) 511 U.S. 1, 17.)

---

[9]     Penal Code section 1096 defines reasonable doubt as follows:  " 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' "

Apart from the standard reasonable doubt definitions, reviewing courts have repeatedly cautioned trial courts and prosecutors to refrain from " 'elaborat[ing] on the meaning of reasonable doubt because the term is not susceptible of precise definition and explanations often are confusing to the jury.' [Citation.]" (*State v. O'Brien* (R.I. 2001) 774 A.2d 89, 110; *People v. Medina* (1995) 11 Cal.4th 694, 745.) For example, it is improper for a prosecutor to suggest that reasonable doubt can be quantified. (*People v. Katzenberger, supra,* 178 Cal.App.4th at p. 1267; see *People v. Otero* (2012) 210 Cal.App.4th 865, 872.) Analogies by the prosecutor (including references to puzzles), that could be construed as suggesting a quantitative (rather than qualitative) measure for reasonable doubt, are perilous and should be avoided. (*Katzenberger, supra,* 178 Cal.App.4th at pp. 1267-1269; *State v. O'Brien, supra*, 774 A.2d at p. 110.) Further, it is impermissible for the prosecutor to invite the jury to base a verdict on speculation rather than on reasonable inferences drawn from the evidence. (*People v. Yeoman* (2003) 31 Cal.4th 93, 149.)

We need not decide whether the prosecutor's puzzle analogy in this case fell outside the bounds of permissible argument, and whether reasonably competent defense counsel would have objected to the argument, because there was no prejudice. This is not a case where the prosecutor's puzzle analogy suggested that a certain quantity of evidence sufficed to establish guilt. (See, e.g., *People v. Katzenberger, supra*, 178 Cal.App.4th at pp. 1267-1268 [prosecutor's statement that Statue of Liberty puzzle with two missing pieces met the beyond-a-reasonable-doubt standard "inappropriately suggest[ed] a specific quantitative measure of reasonable doubt; i.e., 75 percent"].)

17

Further, the prosecutor did not overtly state that the jury should speculate about the contents of the missing pieces of the puzzle. To the contrary, the jury could have reasonably construed the prosecutor's statement that the jury must be able to see "what happened" "even with pieces missing" as meaning the evidence must be sufficient to prove guilt based *solely on the pieces (i.e., evidence) presented*. Further, to the extent the jury might have thought the prosecutor meant it could draw *reasonable, nonspeculative* inferences from the existing pieces (i.e., from the evidence presented) to fill in the missing pieces, this was not improper.

To the extent the argument might have been erroneous, any error was overridden by other correct statements to the jury concerning the beyond-a-reasonable-doubt standard. The trial court instructed the jurors that "[p]roof beyond a reasonable doubt is proof that leaves you with an *abiding conviction* that the charge is true" and that the jurors must "impartially compare and consider *all the evidence* that was received throughout the entire trial." (Italics added.)[10] The court also instructed the jurors that they must "decide what happened, based *only on the evidence* that has been presented to you in this trial." (Italics added; see CALCRIM No. 200.) The court further instructed that "*each fact* essential" to a conclusion derived from circumstantial evidence must be

_____

[10]    In the language of CALCRIM No. 220, the jury was told: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

18

proven beyond a reasonable doubt; a verdict could not be based on circumstantial evidence unless the jurors were "convinced that the *only reasonable conclusion* supported by the circumstantial evidence is that the defendant is guilty"; and the jurors must "*accept only reasonable conclusions and reject any that are unreasonable*."[11]  (Italics added.) From these instructions, the jurors were expressly informed of the abiding conviction standard, and they would have readily understood that their verdict could not be based on speculation but had to be derived from reasonable inferences drawn from the evidence.

Also, in closing arguments the prosecutor acknowledged that the beyond-a-reasonable-doubt standard was "a very high standard"; a "high burden"; the jury had to be convinced "by more than by a preponderance"; and the jury could "only consider reasonable conclusions."  Defense counsel emphasized to the jury that beyond a reasonable doubt required "an abiding conviction" that the person is guilty, and that "probably guilty" or "really suspicious" would not suffice.

Considering the nature of the prosecutor's puzzle analogy, the instructions provided to the jury, and the closing arguments in their totality, we are satisfied the jurors

---

11      This instruction stated in part:  "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.  [¶]  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  [¶] . . . [¶] Therefore, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  [¶]  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."  (See CALCRIM Nos. 224, 225.)

19

properly understood the beyond-a-reasonable-doubt standard. There is no reasonable probability defense counsel's failure to object to the puzzle analogy argument affected the outcome; accordingly, defendant's ineffective representation claim fails.

DISPOSITION

The judgment is affirmed.

 

 

 

| |
| --- |
| HALLER, J. |

WE CONCUR:

| |
| --- |
| HUFFMAN, Acting P. J. |

| |
| --- |
| IRION, J. |

20